No. 05-378

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 62

W. STEVE SELTZER,

Plaintiff, Appellant, and
Cross-Respondent,

v.

STEVE MORTON, GIBSON, DUNN
& CRUTCHER, LLP, and DENNIS A.
GLADWELL,

Defendants, Respondents,
and Cross-Appellants.

APPEAL FROM:    The District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. ADV 2003-173,
Honorable Dirk M. Sandefur, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Alexander Blewett, III (argued), Joseph P. Cosgrove, Hoyt & Blewett,
Great Falls, Montana

For Respondents:

Keith Strong (argued), Dorsey & Whitney, Great Falls, Montana

Gary L. Graham, Garlington, Lohn & Robinson, PLLP,
Missoula, Montana

Theodore J. Boutrous, Jr., John J. Swenson, Gibson, Dunn
& Crutcher, LLP, Los Angeles California

For Amicus Curiae:

Lawrence A. Anderson, Attorney at Law, Great Falls, Montana
(for the Montana Trial Lawyers Association)

Leonard H. Smith, Kimberly S. More, Crowley, Haughey, Hanson, Toole
& Dietrich, PLLP, Billings, Montana
(for the Montana Defense Trial Lawyers, Inc.)

_____

Argued and Submitted:  June 28, 2006
Decided:    March 12, 2007

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     This appeal follows a civil jury trial conducted in the District Court of the Eighth Judicial District, Cascade County.  The Plaintiff, W. Steve Seltzer ("Seltzer"), filed suit against Steve Morton ("Morton"), Dennis A. Gladwell ("Gladwell"), and Gibson, Dunn & Crutcher, L.L.P., ("GDC") (collectively "Defendants"), claiming that they had committed the torts of malicious prosecution and abuse of process.  In the first phase of trial, the jury found in favor of Seltzer and awarded $1.1 million in compensatory damages.  At this time, the jury also determined that the Defendants should be subjected to a punitive sanction.  In the second phase of trial, the jury assessed punitive damages in the amount of $100,000.00 against Morton, $150,000.00 against Gladwell, and $20 million against GDC.  The District Court reviewed the punitive damages verdicts, pursuant to both Montana statutory law and federal caselaw, and issued an order reducing the sanction against GDC to $9.9 million.

¶2     Seltzer has filed an appeal, arguing that the District Court erred in reducing the punitive damages verdict.  The Defendants have filed a cross-appeal, arguing that the court erred by not further reducing the punitive damages verdict.  Additionally, the Defendants have presented numerous other cross-appeal issues that were raised during trial and in post-verdict motions.  We will address these various cross-appeal issues before considering the propriety of the District Court's decision regarding punitive damages.  Specifically, in this order, we consider:

¶3     (1) Did the District Court err in instructing the jury regarding Seltzer's two theories of liability?

3

¶4 (2) Are the Defendants entitled to judgment as a matter of law on Seltzer's abuse-of-process claim?

¶5 (3) Are the Defendants entitled to a new trial based on the District Court's evidentiary rulings?

¶6 (4) Are the Defendants entitled to a new trial or remittitur based on Seltzer's closing argument?

¶7 (5) Is the jury's award of compensatory damages supported by substantial credible evidence?

¶8 (6) Did the District Court err in not applying the current statutory cap on punitive damages?

¶9 (7) Did the District Court err in following Montana statutory law regarding evidence of a defendant's financial condition?

¶10 (8) Is GDC entitled to judgment as a matter of law on the punitive damages verdict?

¶11 (9) Did the District Court err in applying federal due process law to the jury's punitive damages award?

¶12 We affirm in all respects.

## FACTUAL AND PROCEDURAL BACKGROUND

¶13 Seltzer is, among other things, a professional appraiser and authenticator of Western American artwork ("Western art"). In late 2000 or early 2001, at the request of an art auction house, he rendered his opinion as to the authenticity of a watercolor painting that Morton owned. Morton subsequently demanded that Seltzer recant his

4

opinion. When he refused to do so, GDC filed a multi-count lawsuit against Seltzer. That lawsuit, which was eventually dismissed with prejudice, is the subject of this litigation.

¶14 Morton's painting, which was at the center of the underlying suit against Seltzer, bears a signature indicating that it is the work of Charles M. Russell ("Russell"). However, Seltzer and a number of other art experts believe the painting is actually the work of Seltzer's grandfather, Olaf Carl Seltzer ("O. C. Seltzer").

¶15 Russell and O. C. Seltzer were renowned Western artists who were contemporaries and friends. They both lived and produced Western art in the area of Great Falls, Montana, beginning in the late 1890's.[1] O. C. Seltzer was a protégé of Russell and they both painted similar types of old west cowboy scenes common in Montana. However, they had distinctly different painting styles and color palettes. O. C. Seltzer's work generally manifested more distinct lines and detail and a more subtle use of color. In contrast, Russell's work generally manifested a more vivid use of color and less distinct, suggested, lines and detail. These differences are often most notable by comparison of the sage brush and the motion of the figures depicted. Although both Russell and O. C. Seltzer are recognized as fine Western artists, Russell's work is more widely known and significantly more valuable.

¶16 Morton's painting, which is known as "Lassoing a Longhorn," depicts action and figures similar to that of other works by both Russell and O. C. Seltzer. Specifically, it

---

[1] Both are now deceased, Russell having passed away in 1926, and O. C. Seltzer having passed away in 1957.

5

depicts two cowboys, mounted on horseback, roping a longhorn steer. This action takes place on open prairie land against the backdrop of a distant cattle herd and another cowboy approaching on horseback. The steer, bearing a brand in the middle of its left side, is positioned near the center of the painting. The two cowboys featured in the foreground are positioned to the left and right of the steer. The cowboy to the left has secured a rope around the steer's horns, while the cowboy to the right is in the process of throwing a large loop towards the steer's hind feet. The overall color scheme is generally subtle, while the lines and details therein are generally distinct. In its lower left corner, the painting bears a signature, a bison skull marking, and a date, all in heavy black ink, purporting that the painting is a 1913 work by Russell. The signature style is similar to that used by Russell in 1913. Additionally, a bison skull insignia resembling that in the painting is a hallmark accompaniment to Russell's signatures. The painting currently measures 16½ by 22¾ inches.

¶17    There is no record or known information regarding the painting's origin, ownership, or whereabouts from 1913 to 1939. In November of 1939, the Newhouse Galleries in New York, New York, sold the painting to Amon Carter of Fort Worth Texas. The Amon Carter Museum's records listed the dimensions of the painting in 1939 as 20⅝ by 26¾ inches—approximately 4 inches wider and 4 inches longer than the current dimensions of the painting. These same dimensions were cited in a 1966 book, discussed below, which catalogued the Museum's collection of Russell works. There is no evidence that the Amon Carter Museum ever authenticated or obtained independent authentication of the painting as a work of Russell.

6

¶18     In February of 1972, the Amon Carter Museum sold the painting to the Kennedy Galleries of New York, New York.  In March of 1972, the Kennedy Quarterly, a publication featuring Western art then owned by the Kennedy Galleries, featured a print of the painting and listed its dimensions as 16½ by 22¾ inches—the same as the current dimensions.  There is no evidence that the Kennedy Galleries ever authenticated or obtained independent authentication of the painting as a work of Russell.

¶19     Morton and his brother, Frank, purchased the painting from the Kennedy Galleries in May of 1972 for $38,000.00.  Other than obtaining verbal assurances from officials of the Kennedy Galleries, the Mortons neither requested nor obtained any proof or independent verification that the painting was an authentic Russell.

¶20     In 1998, Morton contacted Bob Drummond ("Drummond"), the Director of the Coeur d'Alene Art Auction, inquiring about the possibility of selling the painting at the Auction's annual Western art auction.  Drummond advised Morton that the Coeur d'Alene Art Auction could sell the "choice C. M. Russell painting" at a "very good price."  In August of 2000, Drummond notified Morton that the painting would likely "fetch a record price" at auction.  Later that month, at Morton's request, Drummond appraised the fair market value of the painting as $650,000.00.  Drummond is an experienced art appraiser familiar with the works of Russell.  However, his aforementioned statements to Morton and his appraisal were premised on the assumption that the painting was an authentic Russell.  He had not authenticated or obtained independent authentication of the painting as a Russell.

7

¶21 In late 2000 or early 2001, Morton decided to proceed with the sale of the painting by way of auction. However, Drummond's partner in the Coeur d'Alene Art Auction, Stuart Johnson, suspected that the painting was a work of O. C. Seltzer. Accordingly, Johnson recommended that Drummond consult with Seltzer before attempting to sell the painting as an authentic Russell.

¶22 Seltzer resides in Great Falls, Montana, which is the home of the C. M. Russell Art Museum. He is the world's foremost expert on the works of O. C. Seltzer, and to a lesser extent, an expert on the works of C. M. Russell. As noted above, Seltzer is a professional authenticator and appraiser of Western artwork. Particularly, he has long been engaged, upon request, in the business of authenticating the works of O. C. Seltzer throughout the country. In addition, Seltzer is a highly accomplished artist, having received numerous honors and awards at the prestigious C. M. Russell Art Auction held annually in Great Falls.

¶23 When Seltzer was contacted by Drummond, he expressed his opinion that, given the style and technique of the painting, it was clearly and obviously not an authentic Russell. Seltzer had seen a photograph of the painting in a 1979 edition of Horizon Magazine and had immediately determined that it was a work of O. C. Seltzer. In Seltzer's opinion, the distinguishing characteristics of the painting, as shown in the photograph, were obvious to a knowledgeable eye and there was therefore no need to inspect the painting itself prior to rendering his opinion. Viewing the original painting at trial in the instant suit, Seltzer pointed out what he had seen clearly in the photograph—i.e., that the color features and finely detailed sagebrush, action figures, and other details,

were characteristic of O. C. Seltzer's work and uncharacteristic of Russell's work around 1913. In conjunction with this testimony, Seltzer also presented four O. C. Seltzer works which contain a steer that is virtually identical to that portrayed in "Lassoing a Longhorn."

¶24 To gather further information regarding the painting's authenticity, Stuart Johnson recommended that Drummond also contact Ginger Renner, who is the premier expert on the works of Russell, and to a lesser extent, the works of O. C. Seltzer. Ms. Renner is the widow of Frederic Renner, who was previously considered the premier expert on Russell's artwork. She was significantly involved in her late husband's work and she has carried on that work in the field of Russell art and Western art in general. In accordance with her expertise, she is considered a reliable authenticator of C. M. Russell art.

¶25 Throughout his life, Mr. Renner studied, documented, catalogued, and collected many Russell works and related information. Among other endeavors, he provided authentication services to Western art collectors, including the Montana Historical Society, and also provided forgery detection assistance to the Federal Bureau of Investigation. In 1956, Montana Magazine published an article by Mr. Renner, based on a speech he had given at a Western art forum in Chicago that year, which chronicled the thriving trade in forgeries of Russell's artwork. It states, in part:

> A dozen or more [forgeries of Russell's artwork] have been offered to the Historical Society of Montana. . . . [A]ll of Russell's admirers and collectors should know some of the information that is available about this dishonest business. It needs publicity if it is to be stamped out. In general there are five categories of "fake" Russells. . . . The third category includes paintings by other artists, with the original signature painted out and Russell's substituted. A few of these are fine paintings but the style of the

9

artist is usually so foreign to Russell's that it is immediately evident what they are.

. . . .

. . . A number of years ago, three oils, painted and signed by [O. C.] Seltzer, the fine Montana artist who still lives in Great Falls, were offered for sale in New York. A few months later, the same paintings were seen in other galleries; but by this time Seltzer's name had been painted out and Russell's substituted, undoubtedly without Seltzer's knowledge. One of these paintings was unsold for several years. Finally, a leading New York dealer made a comment about it that reveals a good deal of the philosophy about forgeries held by some individuals. He said, "it's too bad the _____ Gallery is trying to sell that Seltzer painting as a Russell; but if they are going to do it, they ought to make it convincing and put the price up around $7,000. Trying to sell it for a measly $3,500 merely spoils the Russell business for the rest of us."

. . . .

Another thing to look at is the Russell signature on the painting. . . . What many do not know is that Russell experimented with his signature, just as he did with the rest of his painting and that he used five distinct styles of signatures; each during a definite and known period of his career.

Frederic G. Renner, *Bad Pennies: A Study of Forgeries of Charles M. Russell Art*, Montana Magazine, Vol. 6, No. 2, Spring 1956.

¶26    In 1966, Mr. Renner published a book entitled *Charles M. Russell: Paintings, Drawings, and Sculpture in the Amon G. Carter Collection*. This book featured a print of "Lassoing a Longhorn" and, as noted above, listed its dimensions as 20⅝ by 26¾ inches—approximately 4 inches wider and 4 inches longer than the current dimensions of the painting. As indicated by the title page, Mr. Renner published the book for the Amon Carter Museum as a catalogue of Russell works then in the museum's collection. At that time, he assumed that "Lassoing a Longhorn" was an authentic Russell, and thus a print of the painting was included in the book. However, this publication was merely a

catalogue of the Amon Carter collection and the text of the book did not assert that the painting was actually an authentic Russell.

¶27     As noted above, Ginger Renner is known in the art world as the premier expert on the works of Russell, and to a lesser extent, the works of O. C. Seltzer, and she is known as a reliable authenticator of C. M. Russell art.  Thus, at Drummond's request in late 2000 or early 2001, she examined a transparency reproduction of the painting.  She then rendered her opinion that it was plainly the work of O. C. Seltzer and that the signature had been altered in some manner.

¶28     Given the expert opinions of Seltzer and Ginger Renner regarding "Lassoing a Longhorn," Drummond contacted Morton in January of 2001 and told him that the Coeur d'Alene Art Auction would not attempt to sell the painting as an authentic Russell because it was apparently a work of O. C. Seltzer.  Later that month, Morton called Seltzer to discuss the issue.  Seltzer generally explained the bases of his opinion regarding the painting's authenticity.  Shortly thereafter, Seltzer sent Morton a letter following up on their conversation.  In this correspondence, Seltzer told Morton that other O. C. Seltzer paintings depict a steer very similar to the steer in "Lassoing a Longhorn."  Seltzer further recommended that Morton examine "a C. M. Russell book and compare a 1913 C.M.R. watercolor with the one you have," and stated "[you will] be able to see the differences."  In closing, Seltzer offered to "be of further help" on request.

¶29     On January 30, 2001, Morton took the painting from his home in California to Ginger Renner's home in Arizona.  Ms. Renner examined the painting and immediately told Morton that, given the palette and style, it was unquestionably the work of

O. C. Seltzer. The next day, Morton sent Ms. Renner a handwritten letter expressing his thanks and his "state of shock" upon learning her opinion of the painting's authenticity. In this letter, Morton also requested that she provide him a letter formally expressing her professional opinion in order to help him determine a course of action.

¶30 The Defendants did not disclose this letter during discovery proceedings in the underlying suit against Seltzer or in the instant suit. When Seltzer eventually moved for sanctions in the instant action to address this conduct, the District Court found that the letter was "unquestionably within the scope" of Seltzer's requests for production in the underlying suit, his requests for production in the instant suit, and the court's Order to Compel in the instant suit. The court also found that the letter "unquestionably goes to the heart of the claims and defenses at issue in this case" and that the Defendants' failure to disclose it was "the second incidence in this action of a failure to produce a highly relevant document adverse to their defense." Further, the court found that the letter "plainly indicates that Morton recognized [Renner's] opinion as credible." Finally, the court found that the failure to disclose "impaired Seltzer's ability to depose key witnesses . . . [and] impaired his ability to meaningfully follow up and investigate." Consequently, the court adjudicated the following facts as a discovery sanction:

> [Following his consultation with Ms. Renner,] Steve Morton at all times knew and believed that Ginger Renner was a recognized and credible expert on the works of both C. M. Russell and O. C. Seltzer. Steve Morton thereafter had no reason to believe that Ginger Renner's analysis or opinion was premature, flawed, or otherwise insufficient in any way. Consequently, as of January 31, 2001, Steve Morton knew that Ginger Renner's opinion created a serious and credible question as to whether the subject painting was in fact an authentic work of C. M. Russell.

The Defendants have not appealed the court's findings or the sanction imposed.

¶31    In February of 2001, at a cost of $200.00 to Morton, Ginger Renner sent him a formal letter stating in pertinent part:

> In my opinion ["Lassoing a Longhorn"] is a painting by the Montana artist, Olaf C. Seltzer. In every aspect, the palette, the draftsmanship is typical of the work of Seltzer. In light of the years of my experience with the work of Charles M. Russell there is nothing about this watercolor that would lead me to believe it was the work of C. M. Russell.

As an attachment to this letter, Ms. Renner included a writing by her late husband from a series of accounts which he entitled "Experiences of a Russell Collector." She stated that it "reveals some of the practices of some of the dealers handling Western American art in the New York art market in the 30's and 40's." Similar to the above-noted account in Frederic Renner's 1956 Montana Magazine article, this account described an incident early in his career where Clyde Newhouse of the Newhouse Galleries, the first known possessor of "Lassoing a Longhorn," admitted to Mr. Renner that the Newhouse Galleries was then knowingly trying to pass off and sell an O. C. Seltzer painting, with a forged Russell signature, as an authentic work of Russell.

¶32    Also in February of 2001, upon Morton's request, the Amon Carter Museum sent him information regarding the provenance of the painting.[2] This information included: (1) the Amon Carter Museum's record listing the dimensions of the painting as 20⅝ by 26¾ inches in 1939; and (2) the Kennedy Galleries' publication listing the dimensions of the painting as 16½ by 22¾ inches in 1972.

---

[2]  As Seltzer testified, the terms "provenance" and "authenticity" have distinct meanings when properly used in reference to artwork: the term "provenance" refers to a work's history of ownership, while the term "authenticity" refers to the source that created the work.

13

¶33 In March of 2001, Morton's attorney, Joshua Rievman of New York, wrote a letter to the Kennedy Galleries stating, inter alia:

> In the past month the Mortons have been shocked to learn that the painting is not a work by Russell. Rather, two recognized experts on Western Art have concluded that the painting is obviously a work by an artist named Olaf Seltzer and that this must have been clear to any reputable dealer in the 1970's. As a result, the Painting, which was projected to fetch approximately $700,000 at auction, is likely worth, at best, only a tenth of this amount.
>
> The Mortons consider Kennedy Galleries' fraudulent (or, at the very least, negligent) misrepresentations to be an extremely serious matter and intend to hold Kennedy Galleries liable for the damages they have suffered.

During discovery proceedings in the underlying suit against Seltzer and the instant suit, the Defendants failed to disclose this letter. Seltzer moved for sanctions in this case and the District Court found that this letter was highly relevant and adverse to the defense. As a sanction for the Defendants' failure to disclose this letter, in addition to other discovery abuses that impeded Seltzer's ability to depose witnesses, the District Court ordered GDC to pay court reporting costs and reasonable attorney fees incurred by Seltzer in moving for discovery sanctions. The Defendants have not appealed the court's findings or the sanction imposed.

¶34 Later in March of 2001, in a written response to this letter, the Kennedy Galleries, through its attorney, asserted its belief that the painting was an authentic Russell. It further asserted that the painting's "provenance" was "unassailable" because it had been purchased from the Amon Carter Museum and because Frederic Renner's 1966 book had listed the painting in the catalogue of Russell works then owned by the Amon Carter Museum. However, the Kennedy Galleries provided no proof of authenticity,

authentication analysis, or refutation of the credentials or opinions of Ginger Renner and Seltzer. In response later that March, Morton's counsel sent another letter to the Kennedy Galleries noting that the painting's current dimensions were substantially different than those on record when it was owned by the Amon Carter Museum. The letter concluded: "This size discrepancy is another of the factors that has caused the Mortons to question the work's authenticity." There is no evidence either that the Kennedy Galleries explained the size discrepancy or that the Mortons ever resolved it.

¶35 Thereafter, despite having admitted his knowledge that the painting was not an authentic Russell, Morton twice attempted to sell the painting as an authentic Russell. First, in June of 2001, he requested that the Kennedy Galleries sell the painting on his behalf. Despite its previous assertions regarding the painting's authenticity, the Kennedy Galleries notified Morton that it would not attempt to sell "Lassoing a Longhorn" as an authentic Russell. Second, in July of 2001, Morton consigned the painting to Christie's Auction House in Los Angeles, California, for sale. Christie's returned the painting to Morton and notified him in writing that "this is not a work we can offer for sale."

¶36 By correspondence in July of 2001, Morton's counsel notified Seltzer, Ginger Renner, and Bob Drummond that the Mortons had "conducted a very thorough search for and analysis of relevant authorities" regarding the painting. This letter described the provenance of the painting from 1939 to 2001 and also noted that Frederic Renner had included the painting in his 1966 catalogue of works then owned by the Amon Carter Museum. In conclusion, the letter summarily stated: "It is clear that the results of our investigation . . . conclusively establish the authenticity of the painting. With this issue

15

now behind us, the Mortons are moving forward to sell the painting with a renewed confidence in its authenticity."

¶37    Although asserting this "renewed confidence," the Mortons had discovered no new information indicating that the painting was an authentic Russell; no new information refuting the acknowledged expert opinions of Ginger Renner and Seltzer; and no new information explaining or resolving the acknowledged discrepancy with the painting's dimensions.   Consequently, Seltzer sent a letter to the Mortons' attorney stating:

> In regard to the "Russell painting" owned by Steve Morton, you have most definitely <u>not</u> established the authenticity.   Your provenance only goes back to 1939, which leaves 13 years unaccounted for (Russell died in 1926).   At best you have established the possible existence of a forgery prior to 1939.
>
> More importantly, the work must stand on its own merits.   I saw a reproduction of this painting in a magazine 15 or 20 years ago and knew instantly that it was an O. C. Seltzer painting with a C. M. Russell signature.   In a discussion with Fred Renner a short time later, he agreed with me.
>
> . . . I can assure you as the grandson of O. C. Seltzer and as a professional artist, my opinion is a highly qualified one.   No two artists paint the same way even though doing similar subject matter. O. C. Seltzer's way of handling paint is slightly different than Russell's and it is obvious to someone like myself who has made a study of both their works.
>
> I certainly have no ax to grind with Steve Morton and in fact am sympathetic to his situation.   However, to represent and sell this painting as an authentic C. M. Russell work is the wrong decision and will perpetuate the problem.   Sooner or later the new owner is going to come looking for his money back.

¶38    Thereafter, Morton secured new counsel—Dennis Gladwell of GDC.    In September of 2001, Gladwell sent Seltzer a correspondence resembling a formal litigation interrogatory seeking responses to ten pointed questions regarding the basis of

16

Seltzer's opinion of the painting. The GDC letterhead on which this correspondence was written indicated that GDC was a large international law firm with offices in Irvine, Los Angeles, Century City, San Francisco, and Palo Alto, California; Dallas, Texas; Denver, Colorado; New York, New York; Washington, D.C.; Paris, France; and London, England.

¶39  In response, Seltzer sent a letter referring Gladwell back to Seltzer's original letter in which he had stated his qualifications and his opinion. Seltzer also stated: "You keep referring back to Fred Renner's book and his opinion, etc. He made a mistake and realized that he had some years later."

¶40  Thereafter, Morton submitted the painting to a paper conservator, Margot Healey of Los Angeles, California, for analysis. She found:

> Examination using ultraviolet radiation did not reveal any irregularities or inconsistencies in the media or the paper that would indicate alteration or repair . . . . Based on visual examination using both ultraviolet illumination and microscopic aids, there is no evidence to suggest any alteration whatsoever has occurred. Specifically, I observed nothing to suggest that a signature had been removed.

As Ms. Healey merely examined the painting to determine whether it had been physically altered, her analysis did not constitute an authentication of the painting as a Russell. Nevertheless, Gladwell then sent a letter to Seltzer, Ginger Renner, the Kennedy Galleries, and the Amon Carter Museum, stating that "the opinions of Ms. Renner and Mr. Seltzer were found to be unsubstantiated" by the paper conservator's report.

¶41  Then, in April of 2002, Gladwell sent a demand letter to Ginger Renner and Seltzer, stating:

1. Each of you will draft a letter to our specifications completely recanting and withdrawing any statement you have previously made regarding the authenticity of the painting currently owned by Mr. Morton.

2. In the letter, among other admissions you will make, you will admit that you did not perform a detailed examination of the painting and that your "opinion" was merely conjecture on your part.

3. You will agree to compensate Mr. Morton for the difference between what the painting sells for today, after we have tried to remove the cloud from its provenance, and what it could have sold for two years ago prior to your defamatory remarks about its authenticity.

4. Independently, you will reimburse Mr. Morton for the time, expense, embarrassment, grief and anxiety he has expended in trying to recover from your actions. The price: an additional $50,000 beyond the loss in value of the painting.

Mr. Morton gave you every chance to withdraw your damaging comments over the better part of eight months during last year. Each of you elected to ignore his pleas or simply dismissed them. You will not have that luxury this time around. We expect immediate cooperation on the drafting of your "withdrawal of opinion" or litigation will be filed without any further discussion. And, given the opportunity afforded you to rectify this wrong, and your refusal to do so, punitive damages will be requested.

Seltzer did not respond.

¶42 Thereafter, Gladwell sent an email to William Claster, a partner in GDC, stating:

We may need to open a new matter to pursue this painting issue I discussed. Erin [Alexander] has agreed to help. . . . The nature of the action will be injunctive relief, defamation of title, declaratory relief. . . . You and I will be the partners. I plan to bill very little time. But all billing will be through the firm as per normal protocol. We will probably put in less than 20-30 hours. You will recall that Steve [Morton] is President of the Bob Hope Desert Classic so I want to do it.

Gladwell was acquainted with Morton through prior representation. At the time of this email, Gladwell was a retired former partner on "of counsel" status with GDC.

Consequently, pursuant to GDC's internal policy, Gladwell was required to obtain the permission of a partner who would be formally assigned to and ultimately responsible to the firm for the case. Claster was a partner authorized to grant Gladwell permission to proceed with the matter. Erin Alexander, referenced in the aforementioned email, was an associate member of GDC. Claster ultimately authorized Gladwell to proceed with the proposed litigation on behalf of GDC.

¶43    In May of 2002, Gladwell sent a letter to Seltzer and Ginger Renner again threatening litigation. Gladwell attached a proposed declaration for Seltzer and Ms. Renner to sign, which stated, inter alia:

> 3.   Although I did not inspect the original, I offered the view that this painting may actually be a Seltzer and that the Russell signature could have been forged.
>
> 4.  By this statement, which was made only casually in conversation, I did not intend to imply that the painting was a fake, a duplicate, a forgery or copy or a Seltzer with an altered signature. It was simply a statement of "possibility" that could apply to any painting including a Russell.
>
> 5.   I am in no position either to authenticate the provenance of Mr. Morton's painting as an original Russell or to deny its provenance. That would require a careful examination of the painting, and perhaps other ink, paper and brush-stroke tests, none of which I performed.
>
> 6.  It is unfortunate that my statement has been misinterpreted.
>
> I declare under penalty of perjury under the laws of the States of (Arizona or Montana) that the foregoing is true and correct and that I executed this Declaration on
> _____, 2002, at _____.

Again, Seltzer did not respond.

19

¶44 On July 16, 2002, William Claster, Gladwell, and Erin Alexander, under the caption and authority of GDC, along with Montana attorney Oliver Goe of the law firm Browning, Kaleczyc, Berry & Hoven, P.C., filed a Complaint against Seltzer, on behalf of Morton and his brother Frank, in the United Stated District Court for the Montana District, Great Falls Division. The Complaint asserted the following separately pled claims against Seltzer: (1) Defamation, by knowingly publishing false statements "with an intent to damage the Mortons" and "with the intent to defame the painting and the Mortons' reputation for honesty and fair dealing"; (2) Declaratory Relief, for judgment that the painting is an authentic Russell; (3) Injunctive Relief, for judgment enjoining him from publicly asserting that the painting is not an authentic Russell; (4) Intentional Interference With Business Relations and Prospective Economic Advantage, by falsely claiming that the painting was not an authentic Russell and making this claim "with the intent to damage the Mortons' ability to sell the painting and to damage the relationship between the Mortons and the Coeur d'Alene Art Auction"; (5) Negligence, by recklessly or carelessly "challenging the authenticity and provenance of the painting" and by "refusing to recant or withdraw his statements when presented with evidence that the signature on the painting was not forged"; and (6) Punitive Damages, for engaging in the aforementioned conduct thus manifesting that he is "guilty of actual fraud and/or actual malice," and because his statements "were made in bad faith" and "his actions were wanton, malicious, and designed specifically to harm and injure the Mortons."

¶45 The Complaint requested relief in the form of declaratory relief, injunctive relief, general damages, special damages, punitive damages, costs, and attorney fees. As for

20

compensatory damages sought, the Complaint alleged that Seltzer's stated opinion had caused the painting's value to be reduced "from the range of $650,000.00 to $800,000.00" down to "something under $50,000.00."

¶46    As noted above, GDC sued Seltzer on behalf of both Morton and his brother Frank.  However, Frank Morton never authorized GDC to file suit on his behalf.  He testified on this subject prior to trial in the instant case, and the parties stipulated that his testimony was true and required no proof.  Consequently, the District Court recounted this undisputed testimony in the Final Pre-Trial Order, stating:

> Frank Morton, Steve Morton's brother . . . has already testified in this case by way of deposition and his testimony is as follows:
> a.      When the instant lawsuit [referring to the underlying suit against Seltzer] was filed, I was unaware that it had been filed or initiated but was told sometime later by my brother, Steve Morton, that it had been filed.
> b.      I never authorized Gibson, Dunn & Crutcher LLP ("GDC") to file the instant lawsuit on my behalf and name me as a plaintiff.
> c.      I never met nor spoke with an attorney from GDC until two days before my deposition in this lawsuit.
> d.      I never spoke with Dennis Gladwell or any other member of GDC before the instant lawsuit was filed.

Frank Morton's deposition referenced above was taken on January 29, 2004, roughly 18 months after GDC filed suit purportedly on his behalf.

¶47    Seltzer retained counsel and served formal discovery requests seeking disclosure and production of all non-privileged documents concerning the authenticity of the painting.  The Defendants responded that they had produced all such information.  However, they did not disclose two non-privileged letters—i.e., the correspondence from Morton to Ginger Renner and the correspondence that Morton's former counsel, Joshua Rievman, had sent to the Kennedy Galleries.  As noted above, the latter correspondence

21

contained key admissions, including: (1) "the Mortons have been shocked to learn that the painting is not a work by Russell. Rather, two recognized experts on Western Art have concluded that the painting is obviously a work by an artist named Olaf Seltzer"; and (2) "The Mortons consider Kennedy Galleries' fraudulent (or, at the very least, negligent) misrepresentations to be an extremely serious matter and intend to hold Kennedy Galleries liable for the damages they have suffered."

¶48 Thereafter, Seltzer filed a Motion for Summary Judgment. In support of this Motion, he obtained and filed affidavits of 10 individuals (including himself and Ginger Renner) who had expertise regarding the works of Russell and O. C. Seltzer. Each of these affidavits expressed the opinion that the painting was not an authentic Russell. Shortly thereafter, the Mortons and their attorneys admitted, in a letter to the Kennedy Galleries, that they had not yet secured "a first class expert on Russell who can testify confidently" that the painting was is an authentic Russell. They also admitted that unless they could do so soon, "the law suit is probably over." Later that December, Gladwell acknowledged in an internal GDC email that "the Mortons may be . . . unable to pursue the current litigation . . . since we have no trial expert and as yet, have been unable to establish a complete provenance . . . and we are quickly running out of time."

¶49 On January 8, 2003, Gladwell sent a demand letter to the Kennedy Galleries and the Amon Carter Museum, stating:

> [T]en declarations have been filed by Mr. Seltzer claiming that the painting is a forgery. Despite repeated requests, neither of [you] have produced an expert who can testify that the painting is a genuine C. M. Russell. . . .
>      Accordingly, demand is hereby made that you provide the Mortons with an authentic C. M. Russell whose value, at today's auction prices,

would sell for $650,000. The Mortons will tender Lassoing a Longhorn to the Museum or the Galleries, as soon as a new Russell has been selected.

Nearly one month later, on February 6, the U.S. District Court dismissed the suit against Seltzer with prejudice pursuant to an unconditional stipulation of the parties necessitated by Morton's and Gladwell's acknowledged awareness that they could not prevail on the merits. In defending himself against this lawsuit, Seltzer incurred over $45,000.00 in legal fees.

¶50 Seltzer subsequently filed suit against the Mortons, Gladwell, GDC associate Erin Alexander, GDC, and Oliver Goe, alleging malicious prosecution and abuse of process. Frank Morton was dismissed, pursuant to a stipulation by the parties, following his deposition wherein he testified that he had never spoken with Gladwell before the suit against Seltzer was filed; that he had never spoken with any other GDC attorney before the suit against Seltzer was filed; and, most importantly, that he had never authorized GDC to file suit against Seltzer on his behalf. Additionally, the District Court granted summary judgment in favor of Erin Alexander and Oliver Goe and thus dismissed them from the suit.[3] In the first phase of trial, the jury found in favor of Seltzer on both his asserted causes of action, awarding $1.1 million in compensatory damages. In the second

---

[3] Seltzer did not contest Goe's Motion for Summary Judgment because, inter alia, the Defendants had not provided Goe with the pertinent factual information regarding the underlying suit. Seltzer did contest Erin Alexander's Motion for Summary Judgment; however, the court ruled in Alexander's favor because, inter alia, the evidence showed that "she acted exclusively in a subordinate support role under the direction of one or more other more senior attorneys" at GDC.

23

phase of trial, the jury awarded punitive damages in the amount of $100,000.00 against Morton, $150,000.00 against Gladwell, and $20 million against GDC.[4]

¶51    The District Court issued an order reviewing the punitive damages verdicts pursuant to Montana statutory law, § 27-1-221(7)(c), MCA, and federal caselaw, *State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513 (2003). This order, wherein the trial judge thoroughly and meticulously analyzed the factual and legal issues, contains numerous findings of fact which we refer to extensively hereinafter. In applying Montana law, the court determined that the punitive verdicts were not excessive. The court further determined that Montana's current statutory punitive damages cap, § 27-1-220(3), MCA, does not apply to this case. In applying federal due process jurisprudence, the court concluded that the punitive verdicts against Morton and Gladwell were not constitutionally excessive, but also concluded that the verdict against GDC did not comport with due process and therefore had to be reduced to $9.9 million. Seltzer then filed an appeal with this Court, after which the Defendants filed a cross-appeal.

¶52    The Montana Trial Lawyers Association and the Montana Defense Trial Lawyers, Inc., have filed amicus curiae briefs addressing the punitive damages issues, for which we are appreciative. The parties presented oral arguments regarding the punitive damages

---

[4] The Defendants' briefing repeatedly misstates the amount of punitive damages rendered in this case. In no less than five instances, Defendants present inflated figures, asserting that the jury awarded $250,000.00 against Gladwell and $20,350,000.00 in total punitive damages. In reality, the jury rendered a $150,000.00 punitive sanction against Gladwell and $20,250,000.00 in total punitive damages. We do not believe these misstatements were made intentionally, but we admonish appellate counsel to observe that most minimal of briefing requirements—i.e., correctly reciting the facts, particularly the facts central to the appeal.

issues in June of 2006, and we thereafter took this case under advisement. We now consider the nine issues previously referred to.

## DISCUSSION

¶53  **(1) Did the District Court err in instructing the jury regarding Seltzer's two theories of liability?**

¶54  The Defendants challenge the jury instruction given by the District Court regarding Seltzer's abuse-of-process claim. However, the Defendants did not object to this instruction in the proceedings below. In fact, the Defendants' trial counsel explicitly stated, during the settling of instructions, that the Defendants had no objection to this particular instruction. We have held that failure to object to a jury instruction at trial constitutes a waiver of the opportunity to raise the objection on appeal. *Geiger v. Sherrodd, Inc*., 262 Mont. 505, 508, 866 P.2d 1106, 1108 (1993). Accordingly, we do not address the Defendants' argument regarding the abuse-of-process instruction.

¶55  Defendants also assert that the District Court erred in instructing the jury regarding Seltzer's malicious prosecution claim. It is well settled that "[a] showing of prejudice is required to reverse a verdict because of an alleged improper instruction." *Stockman Bank of Montana v. Potts*, 2006 MT 64, ¶ 80, 331 Mont. 381, ¶ 80, 132 P.3d 546, ¶ 80; *Wilhelm v. City of Great Falls*, 225 Mont. 251, 262, 732 P.2d 1315, 1322 (1987) (stating that a judgment will not be reversed based on an erroneous jury instruction unless the error prejudiced the complaining party). Here, although the Defendants make a substantive argument alleging instructional error, they present no explanation as to how they may have been prejudiced. Moreover, this Court is not obligated to develop such an

25

argument on behalf of the Defendants. *In re Estate of Bayers*, 1999 MT 154, ¶ 19, 295 Mont. 89, ¶ 19, 983 P.2d 339, ¶ 19. Because the Defendants have failed in this regard, they cannot establish that any instructional error constitutes a basis upon which we should reverse the District Court. Accordingly, we do not address the Defendants' deficient argument regarding the malicious prosecution instruction.

¶56 **(2) Are the Defendants entitled to judgment as a matter of law on Seltzer's abuse-of-process claim?**

¶57 In *Brault v. Smith*, 209 Mont. 21, 28-29, 679 P.2d 236, 240 (1984), this Court held: "Essential to proof of abuse of process is (1) an ulterior purpose and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding." *Brault* also indicated that an abuse of process entails "an attempt by the plaintiff to use process to coerce the defendant to do some collateral thing which he could not be legally and regularly compelled to do." *Brault*, 209 Mont. at 29, 679 P.2d at 240. Here, the Defendants moved the District Court for judgment as a matter of law on Seltzer's abuse-of-process claim. The court denied this motion.

¶58 On appeal, the Defendants present two arguments in seeking judgment on Seltzer's abuse-of-process claim. First, the Defendants contend that they are entitled to judgment because Seltzer "based his abuse-of-process claim *solely* on the filing of the complaint" in the underlying suit, and the mere filing of an unfounded lawsuit cannot, as a matter of law, establish an abuse of process. (Emphasis supplied by Defendants.) We must reject the factual assertion contained in this argument because it is contrary to the record before us. The record clearly establishes that Seltzer did not base his

abuse-of-process claim on the isolated fact that the Defendants filed a lawsuit against him. He based his claim on the Defendants' purpose in bringing the suit, as well as their conduct of utilizing the suit as an instrument of coercion, rather than a legitimate means to resolve a genuine dispute. Indeed, Seltzer's Complaint in this suit explicitly specified an alleged "ulterior motive" and Defendants' *use* of the lawsuit as the basis for the abuse-of-process claim—i.e., Seltzer alleged that the Defendants used the lawsuit "to attempt to force Seltzer to untruthfully recant his opinion." This use of litigation, Seltzer further alleged, was "a use perverted beyond the legal and intended purpose of judicial process." Additionally, the District Court's Final Pre-Trial Order reiterated these allegations as the basis for Seltzer's abuse-of-process claim. This Order also identified more specific grounds for this particular claim—i.e., it stated that Seltzer contended the Defendants had no intention of taking the underlying case to trial and that they simply utilized the lawsuit as a means to force Seltzer to recant his opinion so as to enable them to sell the painting as an authentic Russell to an unsuspecting buyer.

¶59 Furthermore, Seltzer presented evidence and argument at trial demonstrating that it was the Defendants' ulterior purpose and their intentional *use* of the underlying lawsuit—not merely the filing of the Complaint—which formed the basis for his abuse-of-process claim. Among other things, Seltzer presented the letters he received from GDC prior to the instigation of the lawsuit, wherein the Defendants threatened to file suit and seek punitive damages if he did not recant, under oath, his professional opinion regarding the authenticity of the painting. Seltzer utilized this evidence to demonstrate that the Defendants' subsequent instigation of legal process was one element

of an ongoing course of intimidating and coercive conduct; that the lawsuit was in fact intentionally employed as a coercive device; and that the Defendants' conduct was therefore an abuse of process.

¶60 Seltzer also presented evidence and argument that the Defendants, while in the course of leveraging the underlying suit against him for nearly seven months, further abused legal process when they undermined the discovery proceedings by intentionally withholding pertinent documents, thereby impairing Seltzer's ability to defend himself. Specifically, Seltzer presented evidence that the Defendants deliberately withheld the Mortons' letter to the Kennedy Galleries wherein they acknowledged that the painting was not an authentic Russell, accusing the Kennedy Galleries of misrepresenting the authenticity of the painting and stating that "the Mortons have been shocked to learn that the painting is not a work by Russell." Additionally, Seltzer demonstrated that the Defendants withheld a letter Steve Morton sent to Ginger Renner wherein he similarly expressed his "state of shock" over Ms. Renner's opinion that the painting was not an authentic work of Russell, and requested that she provide him a letter formally expressing her professional opinion in order to help him determine a course of action. Seltzer also used these documents to demonstrate that the Defendants had proceeded with an ulterior purpose. In short, the record directly refutes the Defendants' premise that Seltzer "based his abuse-of-process claim *solely* on the filing of the complaint" in the underlying suit. Accordingly, we reject the Defendants' argument that they are entitled to judgment on Seltzer's abuse-of-process claim on this basis.

¶61    Second, the Defendants argue that they are entitled to judgment as a matter of law on Seltzer's abuse-of-process claim pursuant to this Court's statement in *Brault* that an abuse of process entails "an attempt by the plaintiff to use process to coerce the defendant to do some collateral thing which he could not be legally and regularly compelled to do." *Brault*, 209 Mont. at 29, 679 P.2d at 240. Here, Defendants assert, Seltzer failed to present proof that they attempted to make him perform some "collateral" act. Again, we find this assertion contrary to the record.

¶62    Seltzer's testimony demonstrated that he genuinely believed the painting was not an authentic Russell and that his statements were specifically intended to convey that opinion. Seltzer also presented the Defendants' letters wherein they explicitly threatened to file suit against him if he did not profess, under oath, that his statements were "not intend[ed] to imply that the painting was a fake, a duplicate, a forgery or copy or a Seltzer with an altered signature." In short, Seltzer presented evidence that the Defendants invoked legal process in order to coerce him to lie about his professional opinion under oath. Yet, the stated purpose for which the Defendants invoked legal process was not to obtain this sworn declaration from Seltzer. Rather, the Defendants' Complaint, which Seltzer also presented as evidence in this case, professed to seek adjudication on the merits of the conflict so as to obtain an injunction, a declaratory judgment, and damages for loss allegedly caused by Seltzer's statements regarding the painting. Thus, the record demonstrates that Seltzer did in fact present proof that the Defendants used legal process "to coerce [him] to do some collateral thing which he

could not be legally and regularly compelled to do." *Brault*, 209 Mont. at 29, 679 P.2d at 240.[5]  Moreover, the District Court, in reviewing the punitive damages award, found that

> the manifest and acknowledged objective of the lawsuit was not to obtain an adjudication of the merits of the asserted claims, but rather to threaten Seltzer and force a negotiated retraction and disavowal of his opinion thereby enabling the Mortons to sell the painting at full market value as an authentic Russell.

Accordingly, having found the Defendants' underlying assertion contrary to the record, we reject the argument that they are entitled to judgment as a matter of law on Seltzer's abuse-of-process claim.

¶63  **(3) Are the Defendants entitled to a new trial based on the District Court's evidentiary rulings?**

¶64  The Defendants identify a number of evidentiary rulings which they contend were erroneous.  Upon these contentions, Defendants seek a new trial.

¶65  District courts are vested with broad discretion in controlling the admission of evidence at trial.  *Lopez v. Josephson*, 2001 MT 133, ¶ 14, 305 Mont. 446, ¶ 14, 30 P.3d 326, ¶ 14.  When reviewing a district court's evidentiary rulings we do not determine

---

[5]  While the *Brault* decision indicates at one point that an abuse of process entails the use of process to coerce another to perform a "collateral" act, it also indicates, at the outset of the discussion regarding abuse of process, that the two *essential* elements of the tort of abuse of process are an ulterior purpose and a use of process which is both willful and improper.  *Brault*, 209 Mont. at 28-29, 679 P.2d at 240.  Similarly, subsequent to *Brault* we have indicated that an abuse of process does not necessarily entail the use of process to coerce another to perform a "collateral" act.  For example, in *Leasing, Inc. v. Discovery Ski Corp.*, 235 Mont. 133, 134, 765 P.2d 176, 177 (1988), where two businesses were involved in a contract dispute, the lease agreement at issue specified that "any cause of action filed as a result of a breach or violation of any terms of this agreement shall be filed in the City of Helena, Lewis and Clark County, State of Montana."  We held that one business committed an abuse of process by filing suit in Granite County and doing so with full knowledge that the other business had already filed suit over the dispute in Lewis and Clark County.  *Leasing, Inc.*, 235 Mont. at 136, 765 P.2d at 178 (citing *Brault*, 209 Mont. at 28-29, 679 P.2d at 240).  While we recognize this inconsistency in our precedents, we need not further address it for the purposes of resolving the present appeal.

whether this Court would have made the same ruling. *Lopez*, ¶ 14. Rather, we determine whether the district court abused its discretion. *Lopez*, ¶ 14. In order to establish that the court abused its discretion, the appellant must demonstrate that "the district court acted arbitrarily without conscientious judgment or exceeded the bounds of reason." *Lopez*, ¶ 14. Our analysis does not end, however, if an appellant demonstrates that a district court has abused its broad discretion in rendering an evidentiary ruling. *In re A.N.*, 2000 MT 35, ¶ 55, 298 Mont. 237, ¶ 55, 995 P.2d 427, ¶ 55. We must then determine whether the demonstrated abuse of discretion constitutes a reversible error. *In re A.N.*, ¶ 55. As we have held, no reversible error occurs unless a substantial right of the appellant is effected, nor does reversible error occur unless the evidence in question was of such character as to have affected the outcome of the trial. *In re A.N.*, ¶ 55.

¶66 With these principles in mind, we address the District Court's contested evidentiary rulings regarding a deposition, several affidavits, expert testimony, and the cumulative impact of these rulings.

**Deposition**

¶67 Following briefing by the parties, the District Court entered its Order to Compel and Protective Order which, among other things, set parameters for discovery in accordance with the attorney-client privilege and the work-product privilege. Then, after the court sanctioned the Defendants for withholding the letter sent to the Kennedy Galleries by Joshua Rievman on Morton's behalf, Seltzer attempted to depose Rievman. Following this deposition, Seltzer filed a motion *in limine* seeking an order prohibiting the Defendants from calling Rievman as a witness or reading his deposition at trial. In

31

support of this request, Seltzer argued that the Defendants had improperly thwarted his questioning and violated the court's aforementioned Order during the deposition by objecting and instructing Rievman not to answer on the basis of attorney-client privilege thirty-three times.

¶68 The District Court refused to bar the Defendants from calling Rievman to testify at trial. However, the court did prohibit the Defendants from presenting Rievman's deposition at trial. In reaching this decision, the District Court determined that the use of Rievman's deposition posed a "potential for confusion and misunderstanding of Rievman's testimony." The Court further reasoned that these potential problems created a "heightened need for precise examination at trial," given the nature of the attorney-client privilege and "the heightened significance of the privilege in the context of the claims and facts at issue."

¶69 M. R. Civ. P. 32(a) governs the use of depositions at trial. One subsection of that rule provides that a witness's deposition may be used at trial if the court finds that "the witness is at a greater distance than 100 miles from the place of trial or hearing, or is out of the United States, unless it appears that the absence of the witness was procured by the party offering the deposition." M. R. Civ. P. 32(a)(3)(B). The Defendants now argue that the District Court erred in prohibiting the use of Rievman's deposition because Rievman was more than 100 miles from the courthouse during trial and the defense did not procure his absence. In support of this argument the Defendants rely on *Rocky Mountain Enterprises v. Pierce Flooring*, 286 Mont. 282, 292-93, 951 P.2d 1326, 1332-33 (1997), wherein this Court held, pursuant to M. R. Civ. P. 32(a)(3)(B), that the

district court erred in prohibiting the use of a party's deposition where that party was living in California and there was no evidence the party's absence was procured by the litigant offering the deposition.[6] The Defendants present the holding of *Rocky Mountain Enterprises* as a categorical rule by which the District Court in the instant action was required to admit Rievman's deposition at trial. We disagree.

¶70 First, the deposition at issue in *Rocky Mountain Enterprises* was not excluded based on its content, as was Rievman's deposition in the instant case. More importantly, M. R. Civ. P. 32(a) outlines circumstances in which depositions may be admissible at trial, but also specifies that the use of such depositions is proper only "so far as admissible under the rules of evidence applied as though the witness were then present and testifying." Thus, the fact that a deposition qualifies for admission under one of the several provisions of M. R. Civ. P. 32(a) does not negate the applicability of other evidentiary rules. In other words, M. R. Civ. P. 32(a) does not trump other evidentiary rules which may justify excluding a deposition when its contents are irrelevant, unfairly prejudicial, or objectionable on any other grounds. Simply put, the Defendants' interpretation of our decision in *Rocky Mountain Enterprises* is inconsistent with M. R. Civ. P. 32(a).

¶71 The Defendants do not argue that the District Court abused its discretion, nor do they challenge the court's determination that Rievman's deposition posed a "potential for confusion and misunderstanding" which heightened the "need for precise examination at

---

[6] Ultimately, however, we held that the court's error was harmless because the evidence in the subject affidavit was cumulative of other evidence presented to the jury. *Rocky Mountain Enterprises*, 286 Mont. at 294, 951 P.2d at 1333.

trial." Thus, because the Defendants' reliance on *Rocky Mountain Enterprises* is inconsistent with M. R. Civ. P. 32(a), and because they do not actually challenge the basis for the District Court's ruling, we conclude that the Defendants have failed to demonstrate that the court abused its discretion in excluding Rievman's deposition.

**Affidavits**

¶72 One of the central issues to be determined in a malicious prosecution claim is whether the party that instigated the underlying lawsuit lacked probable cause for doing so. *Plouffe v. Mont. DPHHS*, 2002 MT 64, ¶ 20, 309 Mont. 184, ¶ 20, 45 P.3d 10, ¶ 20. As we indicated in *Plouffe*, this determination turns on the facts known to the suing party at the time the lawsuit was filed. *Plouffe*, ¶ 18. Relying on *Plouffe*, the District Court instructed the jury to make the probable cause determination based on the facts known to the Defendants when they sued Seltzer. The District Court also instructed the jury that in making this determination "you may consider whether defendant could or should have made further inquiry or investigation as an ordinarily prudent person would have made in the same circumstances before initiating such a lawsuit." In rendering this portion of the instructions, the District Court relied on *Rickman v. Safeway Stores, Inc.*, 124 Mont. 451, 458-59, 227 P.2d 607, 611 (1951), a malicious prosecution case wherein this Court indicated that instigating a legal proceeding without first making a reasonable inquiry or investigation is grounds for finding a lack of probable cause. Consideration of the suing party's investigation prior to filing suit is consistent with our holding in *Plouffe* that a determination of probable cause must take into account the totality of the circumstances. *Plouffe*, ¶ 19. The Defendants do not challenge these instructions on appeal.

¶73    At trial, in accordance with *Plouffe*, the District Court precluded the Defendants from presenting information they obtained *after* suit was filed as a means of establishing probable cause.  The Defendants were, of course, allowed to present the evidence they had *at the time* the suit was filed in arguing that probable cause existed.  Seltzer, in turn, argued that this evidence was insufficient to establish probable cause.  Seltzer also presented evidence to demonstrate that the Defendants did not conduct a reasonable investigation regarding the painting's authenticity and, that if they had done so, they would have discovered readily available information supporting Seltzer's opinion that it was not an authentic Russell.

¶74    For example, upon questioning by Seltzer's counsel, the Defendants admitted that they had not established a complete provenance for the painting before suing Seltzer.  Morton admitted that he had not even made an effort to discover the provenance from 1913 to 1939 before filing the lawsuit.  The Defendants also admitted that, despite their knowledge of the Montana Historical Society and the C. M. Russell Museum, they did not bother to contact these institutions to obtain relevant information before suing Seltzer.  Further, the Defendants admitted that, other than their communications with Seltzer and Ginger Renner, they did not take any steps to have the painting authenticated by a Russell expert before suing Seltzer.   Seltzer's counsel also solicited testimony from an experienced trial attorney, Tom Lewis, indicating that the Defendants' failure, before filing the lawsuit, to obtain an expert willing to testify that the painting was a Russell, constituted a significant deficiency in their investigation.

¶75 Seltzer testified that the Defendants could have obtained relevant information from the C. M. Russell Museum and the Montana Historical Society, both of which contain an abundant amount of information regarding Russell and his work. Seltzer also testified that these institutions would have directed the Defendants to individuals with expert knowledge regarding Russell artwork, such as Robert Morgan, formerly the Curator of Collections at the Montana Historical Society for fifteen years. Morgan has appraised the work of Western artists throughout his lengthy career in the art world, including the work of O. C. Seltzer, and he is an acknowledged authority on Russell's work, having appraised and authenticated several hundred Russell pieces over the last forty years.

¶76 Additionally, Seltzer presented Morgan's affidavit, which Seltzer had obtained while defending himself in the underlying suit, wherein Morgan stated his opinion that the painting was not an authentic Russell. Seltzer also presented the eight other affidavits he had obtained in the underlying suit, including affidavits of experts closely associated with the Montana Historical Society and the C. M. Russell Museum, as well as the affidavits of Ginger Renner, and Bob Drummond, all of whom opined that the painting was not an authentic Russell.

¶77 The Defendants argue that the District Court erred in admitting the affidavits. Specifically, the Defendants argue that the affidavits were irrelevant to the probable cause inquiry because they were acquired after the lawsuit was filed and, pursuant to *Plouffe*, the probable cause inquiry turns on information known by the suing party at the time suit was filed. Additionally, the Defendants argue that the admission of the affidavits was particularly unfair in light of the fact that Defendants were not allowed to

present evidence they had acquired after filing suit as a means to establish probable cause.

¶78 Defendants rely on the fact that Seltzer acquired these affidavits after the underlying lawsuit was filed. However, Defendants do not claim that they were unaware of the information contained in these affidavits when the suit was filed. In fact, the record demonstrates that the Defendants *were* aware of the opinions of Ginger Renner and Bob Drummond as expressed in these affidavits. Thus, Defendants' complaint about these particular affidavits is without merit.

¶79 As for the remaining affidavits, even assuming that the Defendants were not aware of the information contained therein, no error is apparent here. Seltzer presented the affidavits as part of the evidence regarding the adequacy of Defendants' investigation prior to filing suit. As evidence of information that was readily available, these affidavits were relevant to the issue of whether Defendants conducted a reasonable investigation before filing suit. *Rickman*, 124 Mont. at 458-59, 227 P.2d at 611; *Plouffe*, ¶ 19. The Defendants do not dispute that Seltzer was entitled to present evidence regarding the reasonableness of their investigation underlying the lawsuit. Further, the Defendants do not dispute that Seltzer was entitled to demonstrate that numerous individuals could have provided Defendants with expert opinions regarding the authenticity of the painting had the Defendants actually sought such information. The affidavits simply showed (assuming the information contained therein was not known by the Defendants) what specific information the Defendants could have obtained with minimal investigative effort prior to filing suit against Seltzer. Thus, we perceive no error in the District

37

Court's decision to admit the affidavits, and there certainly is no indication that the court "acted arbitrarily without conscientious judgment or exceeded the bounds of reason" in doing so. *See Lopez,* ¶ 14. Accordingly, we conclude that the Defendants have failed to demonstrate that the District Court abused its discretion in admitting the affidavits.

**Expert Testimony**

¶80 Prior to trial, the parties disputed the propriety of expert testimony on various subjects. Accordingly, the District Court entered its Omnibus Order which, inter alia, set parameters for the testimony of Duane Chartier, an expert in art conservation, and the testimony of Tom Lewis, an expert trial attorney. At trial, Chartier testified regarding, inter alia, the reputation of the Amon Carter Museum and the Kennedy Galleries, the significance of a gap in a painting's provenance, and the kind of analysis and methodology that is reasonably relied upon by knowledgeable people in the art world in determining whether artwork has been altered. Lewis testified regarding, inter alia, the nature and implications of the claims asserted in the underlying suit against Seltzer, and the responsibility that attorneys have, prior to filing a lawsuit, to verify that a factual basis exists to support the suit.

¶81 The Defendants now challenge the District Court's decision requiring that they submit in writing, for pre-approval, the questions they intended to ask Chartier. The Defendants also argue that the District Court erred in allowing Lewis's testimony, claiming that he testified on subjects outside his area of expertise and invaded the province of the jury by offering legal conclusions and applying the law to the facts of the case. We determine that these arguments are flawed by virtue of inadequacy.

¶82 As noted above, when considering a district court's evidentiary rulings, we do not merely determine whether the rulings constitute an abuse of discretion; we must also determine whether the impact of a demonstrated abuse of discretion warrants reversal. *In re A.N.*, ¶ 55. Here, although the Defendants contest the District Court's evidentiary rulings, they present no explanation as to how these alleged errors could have affected their substantial rights or affected the outcome of the trial. Without providing such an explanation, the Defendants cannot demonstrate that a reversible error has occurred here. Moreover, we are not obligated to develop such an argument on behalf of an appellant. *In re Estate of Bayers*, 1999 MT 154, ¶ 19, 295 Mont. 89, ¶ 19, 983 P.2d 339, ¶ 19. Accordingly, we will not address these inadequate contentions.

**Cumulative Impact**

¶83 Finally, the Defendants assert, with no supporting analysis, that the "cumulative impact" of the District Court's evidentiary rulings "preordained the outcome" of the trial.[7] As for the District Court's decision to preclude the use of Rievman's deposition in favor of live testimony, the Defendants have failed to demonstrate that the court abused its discretion in any way. Similarly, as for the District Court's decision to admit the affidavits as evidence of information the Defendants could have obtained with minimal investigative effort prior to filing suit against Seltzer, the Defendants have failed to

---

[7] At this point in their brief, the Defendants interject a conclusory, one-sentence argument that an instructional error contributed to the "cumulative impact" of the alleged evidentiary errors. Defendants assert that the District Court erred in instructing the jury regarding the propriety of Seltzer's actions in defending himself during the underlying suit and his duty to respond to the Defendants' requests for an explanation of his opinion regarding the authenticity of the painting. We will not address this argument because the Defendants fail to support it with analysis or citation to legal authority, as required by M. R. App. P. 23(a)(4). *State v. Buck*, 2006 MT 81, ¶ 28, 331 Mont. 517, ¶ 28, 134 P.3d 53, ¶ 28.

demonstrate that the court abused its discretion in any way. And as for the court's decisions regarding expert testimony, the Defendants have failed to present any explanation as to how the alleged error could have affected their substantial rights or affected the outcome of the trial. Accordingly, we will not reverse the District Court based on the "cumulative impact" of its evidentiary rulings.

¶84    **(4) Are the Defendants entitled to a new trial or remittitur based on Seltzer's closing argument?**

¶85    The Defendants argue that Seltzer's counsel made improper closing arguments that caused the jury to act with passion and prejudice in rendering the punitive damages award. The Defendants characterize these remarks as "appeals to local sympathies" which were intended to foster prejudice against them. Upon these contentions, the Defendants argue that they are entitled to "a new trial or significant remittitur."

¶86    In support of this argument, the Defendants specify the following remarks as improper. First, Seltzer's counsel stated that Seltzer was "born and raised here in Great Falls" and had "[m]ade this his home." The transcript reveals that this statement was made as a part of counsel's argument that Seltzer's reputation had been damaged by the Defendants' allegations of intentional wrongdoing. Given that this statement was merely a recitation of facts that were previously presented during trial without objection, and given the evidence indicating that Seltzer suffered reputational harm in the Great Falls community, we find nothing inappropriate in counsel's observation regarding Seltzer's history and residence in Great Falls.

¶87     Second, Seltzer's counsel referred to GDC in one instance as a "great law firm from Los Angeles."  As was the former statement, this remark was grounded in the evidence of record—i.e., the facts regarding GDC's size and location were presented to the jury during trial.  Moreover, it is undisputed that the evidence of GDC's size and location was properly admitted.  Thus, we find nothing inappropriate in this statement.

¶88     Third, counsel argued that GDC had sought to "use their power and their prestige and their situation as this 800 person law firm to wreak terror and harm on Steve Seltzer." One of the jury's primary tasks was to determine the Defendants' purpose in suing Seltzer.  The transcript reveals that counsel prefaced this comment by stating that it was a conclusion supported by the evidence.  Defendants present no authority indicating counsel was not entitled to argue that the evidence supported particular conclusions. Further, counsel's reference here to GDC's size was merely reflective of evidence that was presented at trial, the admission of which has not been appealed.  Thus, we find nothing inappropriate in counsel's remark.  Moreover, we note that immediately prior to counsel's argument the District Court provided appropriate context by instructing the jury:  "You are not to regard arguments, statements and remarks of attorneys as evidence, and you should disregard them if they are not supported by evidence properly presented and received."

¶89     Finally, counsel stated:  "They sued [Seltzer].  Because they figured [he] was not going to be able to defend himself up here in old Great Falls, Montana."  Again, one of the jury's primary tasks was to determine the Defendants' purpose in filing the underlying suit.  The transcript reveals that counsel made this remark in questioning the

Defendants' motives for suing Seltzer rather than the Kennedy Galleries, which sold the painting to the Mortons, or Stuart Johnson of the Coeur d'Alene Art Auction, who initially questioned the authenticity of the painting when Morton first sought to sell it. Thus, we find nothing inappropriate in counsel's remark to the extent that it addresses the issue of intent. To the extent this remark may have suggested to the jury that Defendants took a dim view of Great Falls or saw the city as a favorable location in which to sue Seltzer, we find this shade of meaning insufficient to establish any significant level of prejudice. Further, we note again that the District Court provided appropriate context for counsel's remarks by instructing the jury members, immediately beforehand, that they were not to regard counsel's arguments as evidence.

¶90 Of course, it would have been improper for counsel to suggest that the jury determine compensatory or punitive liability based on Seltzer's status as an individual Montanan and GDC's status as a large, out-of-state law firm. However, there is nothing inappropriate in mentioning the relative size, position, and attributes of the litigants in a closing argument when those facts were presented during the trial. Indeed, the Defendants have not appealed the District Court's ruling *in limine* that evidence regarding GDC's "institutional reputation, size, published hourly rates, and marketed scope of work are highly relevant and admissible evidence as to Seltzer's claimed emotional distress" and other aspects of the case.

¶91 The Defendants cite no authority to support their assertion that counsel's remarks were improper. Rather, they merely rely on their characterization of these remarks in asserting that the jury acted with passion and prejudice in rendering the punitive verdict.

We note that the District Court guarded against such an outcome by instructing the jury, immediately prior to closing arguments, to "weigh and consider this case without sympathy, passion or prejudice for or against any party or person." We also note that the challenged remarks represent a very small portion of counsel's closing argument, which takes up more than twenty-two pages in the trial transcript.

¶92 Moreover, none of the challenged remarks were made during counsel's arguments in the punitive damages proceedings, which were held after the jury rendered its first verdict awarding compensatory damages. In the subsequent punitive damages proceedings, Seltzer's counsel offered only a few comments to the jury and did not argue for any particular amount of punitive damages against GDC, instead stating: "You can determine what the appropriate amount is. And the idea is, obviously, not to bankrupt this company. That's not the idea at all. The idea is to assess an amount that you think will deter them and that you think will punish them appropriately." Finally, counsel made each of the challenged remarks in different contexts and at different stages in his argument, and we will not view them out of context as they are presented by the Defendants here. Accordingly, having considered the challenged remarks both individually and collectively in the context of counsel's entire closing argument, we reject the Defendants' argument.

¶93 **(5) Is the jury's award of compensatory damages supported by substantial credible evidence?**

¶94 The jury's function is to weigh and resolve conflicts in the evidence, to judge the credibility of the witnesses, and to make the factual determinations necessary to render a

43

verdict, including the determination of compensatory damages to be awarded. *Sandman v. Farmers Ins. Exchange*, 1998 MT 286, ¶ 45, 291 Mont. 456, ¶ 45, 969 P.2d 277, ¶ 45; *Onstad v. Payless Shoesource*, 2000 MT 230, ¶ 50, 301 Mont. 259, ¶ 50, 9 P.3d 38, ¶ 50 (overruled in part on other grounds in *Johnson v. Costco Wholesale*, 2007 MT 43, ¶ 21, ___ Mont. ___, ¶ 21, ___ P.3d ___, ¶ 21). This Court "must exercise the greatest self-restraint in interfering with the constitutionally mandated processes of jury decision." *Kneeland v. Luzenac America Inc.*, 1998 MT 136, ¶ 53, 289 Mont. 201, ¶ 53, 961 P.2d 725, ¶ 53. Accordingly, the scope of our review of a jury verdict in a civil case is "necessarily very limited." *Kneeland*, ¶ 45. We do not substitute our judgment for that of the jury—i.e., we do not repeat the jury's tasks so as to determine whether we would have rendered the same verdict had we been in the jury's position. *Onstad*, ¶ 50; *French v. Ralph E. Moore, Inc.*, 203 Mont. 327, 336, 661 P.2d 844, 849 (1983). Rather, this Court defers to the jury's constitutionally sanctioned decisional role, Article II, § 26, as it is not our role to retry a case or reweigh evidence on appeal, *Smith v. General Mills, Inc.*, 1998 MT 280, ¶ 19, 291 Mont. 426, ¶ 19, 968 P.2d 723, ¶ 19. Thus, our task on review is simply to determine whether the verdict is supported by substantial credible evidence, which is defined as evidence that a reasonable mind might accept as adequate to support a conclusion. *Satterfield v. Medlin*, 2002 MT 260, ¶ 23, 312 Mont. 234, ¶ 23, 59 P.3d 33, ¶ 23. In making this determination, we must view the evidence in the light most favorable to the prevailing party. *Satterfield*, ¶ 13. Moreover, as we have held, the prevailing party is entitled to any reasonable inference that can be drawn from the facts. *Sandman*, ¶ 41. As it is the jury's function to determine the weight and credibility of the

evidence, this Court has held that evidence will be considered substantial even if we view it as "inherently weak and conflicting" and "somewhat less than a preponderance"; however, it must consist of "more than a mere scintilla of evidence" and it must rise above the level of "trifling or frivolous." *Sandman*, ¶¶ 40, 41.

¶95 As noted above, the jury awarded Seltzer $1.1 million in compensatory damages. The Defendants argue that this award is excessive and is not supported by the evidence. In support of this argument, the Defendants characterize the jury's compensatory verdict solely as an "emotional distress award" and claim that it is larger than any "emotional distress award" ever upheld on appeal in Montana's history. The Defendants also present a chart summarizing emotional distress awards upheld on appeal in Montana, and suggest that we should evaluate the compensatory award here in light of the smaller awards in these other cases and thus set aside or significantly reduce the jury's compensatory award.

¶96 We note that the Defendants cite no authority for the notion that we may meddle with a jury's compensatory verdict in one case based on the size of a compensatory verdict rendered in another case. More to the point, we have already rejected this approach. In *Onstad*, where we considered whether a substantial compensatory award was "excessive and unsupported by the evidence," the appellants suggested that we consider the size of awards in other cases in rendering our decision. *Onstad*, ¶¶ 1, 48, 49. We declined to do so and, instead, made our decision based solely on the facts in the case before us. *Onstad*, ¶¶ 50-52. Similarly here, we reject the notion that a compensatory award for emotional distress upheld in one case is in any way relevant to the propriety or

45

size of an emotional distress award in another case. Indeed, two victims of the same tortious conduct may be impacted in dramatically different ways. Moreover, the proper measure of compensatory damages must be determined solely based on the facts of each case, *French*, 203 Mont. at 336, 661 P.2d at 849, and juries have wide latitude in this regard, *Gibson v. Western Fire Ins. Co.*, 210 Mont. 267, 290, 682 P.2d 725, 738 (1984). Thus, one jury may legitimately render a compensatory award that is significantly different from an equally legitimate compensatory award rendered by another jury upon substantially similar facts. It simply is not our role to ensure any level of uniformity among compensatory awards in different cases—even cases with similar factual scenarios.[8] Rather, as noted above, we must exercise "the greatest self-restraint in interfering with the constitutionally mandated processes of jury decision," *Kneeland*, ¶ 53, and recognize that it is the jury's function to weigh and resolve conflicts in the evidence, to judge the credibility of the witnesses, and to make the factual determinations necessary to render a verdict, *Sandman*, ¶ 45. Thus, we will not consider compensatory awards rendered and upheld in other cases in determining the propriety of the compensatory award at issue here.

¶97 Moreover, we reject the Defendants' assertion that the award here simply represents compensation for emotional distress. As discussed below, Seltzer not only

---

[8] As the United States Supreme Court has observed, although the collective judgment of a jury may be difficult to explain, "the inherent lack of predictability of jury decisions does not justify their condemnation. On the contrary, it is the jury's function to make the difficult and uniquely human judgments that defy codification and that build discretion, equity, and flexibility into a legal system." *McCleskey v. Kemp*, 481 U.S. 279, 311, 107 S.Ct. 1756, 1777 (1987) (discussing jury decisions in the capital sentencing context) (citation and internal quotation marks omitted).

presented evidence of emotional distress resulting from Defendants' acts, he also presented evidence that his personal and professional reputation was harmed and that he incurred substantial expense in defending himself. Consistent with this evidence, the instructions given by the District Court directed the jury to determine compensatory damages, if finding for Seltzer on the question of liability, upon consideration of "the following elements of damages: (1) reasonable attorney fees incurred in defending against the underlying lawsuit; (2) injury to plaintiff's reputation resulting from defendants' acts; (3) emotional distress resulting from defendants' acts." The jury's verdict did not designate a separate amount of compensation awarded for each of these three elements of damage; it merely listed one amount rendered for all compensatory damages.[9] Thus, it is impossible to know how the jury apportioned the compensatory award with respect to the three elements of damage, and we certainly will not speculate in this regard. Accordingly, we reject the Defendants' assertion that the compensatory award represents compensation solely for emotional distress. Similarly, we also reject Seltzer's assertion that "the compensatory damages were comprised mainly of the extensive damages to Seltzer's reputation."

¶98 The Defendants also assert that the compensatory award was not "based on the actual harm Plaintiff claimed to have suffered, but rather was based on the amount of money Plaintiff could potentially have lost if Defendants had won the underlying lawsuit." We find this assertion purely speculative and unsupported by the record. As

---

[9] Neither Seltzer nor the Defendants proposed a verdict form that would have required the jury to designate a separate amount of compensation for each element of damages.

noted above, the instructions given by the District Court directed the jury to determine compensatory damages, if finding for Seltzer on the question of liability, simply upon consideration of reasonable attorney fees incurred by Seltzer in defending against the underlying lawsuit, injury to Seltzer's reputation resulting from Defendants' acts, and emotional distress resulting from Defendants' acts. The instructions did not allow the jury to award compensatory damages based on any other factors, and we will not assume that the jury disregarded the given instructions by rendering a verdict based on Seltzer's potential loss in the underlying suit. Thus, we reject the Defendants' assertion.

¶99    Additionally, the Defendants assert that the jury's compensatory award "was not intended to compensate Plaintiff for his actual losses" but "was intended to punish Defendants." Again, we find this assertion purely speculative and unsupported by the record. Defendants provide no analysis to support this assertion. Rather, they merely cite to a portion of *State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513 (2003), wherein the United States Supreme Court, in discussing a compensatory damages award for emotional distress and a punitive damages award, stated that the compensatory damages assessed "likely were based on a component which was duplicated in the punitive award." *Campbell*, 538 U.S. at 426, 123 S.Ct. at 1525. The Supreme Court then noted: "Much of the distress was caused by the outrage and humiliation the Campbells suffered at the actions of their insurer; and it is a major role of punitive damages to condemn such conduct." *Campbell*, 538 U.S. at 426, 123 S.Ct. at 1525.

¶100 However, the *Campbell* Court was discussing a compensatory award rendered simply for emotional distress damages, *Campbell*, 538 U.S. at 426, 123 S.Ct. at 1524, whereas the compensatory award at issue here, as noted above, cannot be characterized purely as compensation for emotional distress.

¶101 Nothing in the record suggests that the jury "intended to punish Defendants" with the compensatory award rather than simply compensating Seltzer for his actual losses, and it certainly is not appropriate for this Court to engage in the rank speculation necessary to reach such a conclusion. First, the instructions cautioned the jury against acting on such an improper impulse, stating: "you must weigh and consider this case without sympathy, passion or prejudice for or against any party or person." Second, the instructions did not allow the jury to award compensatory damages as a means of punishing the Defendants. Rather, as noted above, the instructions clearly delineated three distinct factors for the jury's consideration in rendering a compensatory award—attorney fees, reputational harm, and emotional distress—and we will not assume that the jury members violated their oath of service by disregarding the given instructions. Thus, we reject the Defendants' assertion.

¶102 Finally, having reviewed the record in light of the applicable standards noted above, we disagree with the Defendants' primary argument that the evidence is insufficient to justify the jury's award of compensatory damages. As noted above, Seltzer presented evidence supporting three types of damage he sustained as a result of the Defendants' conduct. First, Seltzer presented evidence demonstrating that he incurred over $45,000.00 in attorney fees in defending himself in the underlying lawsuit.

In conjunction with this proof, Seltzer presented evidence demonstrating that the defense work performed by his counsel in the underlying suit was reasonable and necessary under the circumstances. Accordingly, the District Court concluded: "as a result of Defendants' tortious conduct, Seltzer reasonably incurred substantial attorney fees and costs in his defense of the underlying lawsuit."

¶103 Second, Seltzer presented evidence demonstrating that he suffered serious damage to his personal and professional reputation as a result of the Defendants' conduct. It is undisputed that prior to the underlying lawsuit Seltzer maintained a sterling reputation in both the local and national Western art community which he had developed over the course of forty years. Seltzer testified: "I'd worked hard all my life to become an expert and competent [as an authenticator and appraiser] and a great painter. And I'd taken every opportunity to become involved in authentication work regarding O. C. Seltzer and I'd just made a lifelong study of it." His reputation was such that he was often called upon by individuals, art galleries, and auction houses throughout the United States, including prominent auction houses such as Sotheby's and Christie's, to perform authentication and appraisal work. Additionally, Seltzer had sold his own paintings in virtually every state in the United States.

¶104 After the Defendants filed the underlying suit, news of their accusations against Seltzer spread throughout the local community at large, as well as the local and national art community. True West Magazine and the Main Antique Digest both ran articles regarding the lawsuit, as did the leading newspaper in Seltzer's hometown, the Great Falls Tribune. Further, news of Defendants' accusations against Seltzer circulated, inter

alia, among local community groups in Great Falls, the C. M. Russell Museum's National Advisory Board, and museums and galleries throughout the United States—institutions that had direct contact with potential customers of Seltzer's authentication and appraisal services and his own artwork.

¶105 Seltzer testified that the amount of authentication work he receives is a function of his reputation in the art world, and that while he had performed hundreds of authentications in the years prior to the underlying lawsuit, he had received only one authentication request in the subsequent three years. Randy Gray, the former President of the Board of C. M. Russell Museum, testified, based on his involvement in the annual C. M. Russell Art Auction and discussions with art collectors and members of the museum's National Advisory Board, that Seltzer's reputation had been tainted as a result of the allegations made in the underlying lawsuit. Similarly, Seltzer's wife testified, based on her communications with many individuals in various groups in the Great Falls community and at the C. M. Russell Art Auction, that the lawsuit had damaged Seltzer's reputation because it caused these people to question his integrity and honesty.

¶106 Consistent with the aforementioned evidence, as well as other evidence presented at trial, the District Court found:

> Over his lifetime, Steve Seltzer developed, in the Great Falls community and in the western art community locally and nationally, an impeccable and highly respected reputation for general honesty, as a quality commercial artist, as the foremost expert and authenticator of O. C. Seltzer art, and in relation to his association with the prestigious C. M. Russell Art Auction. As a result of a few publications and word of mouth in the western art world and in the local community, word of the Mortons' lawsuit damaged Steve Seltzer's reputation in western art circles and in the local community.

The court ultimately found that the harm Defendants caused Seltzer was "serious damage to his personal and professional reputation."

¶107 Third, Seltzer presented evidence demonstrating that the Defendants' conduct caused him emotional distress and resultant physical complications. Among other things, Seltzer presented the letter he received from the Defendants in April of 2002 which threatened litigation and stated "you will draft a letter to our specifications completely recanting and withdrawing any statement you have previously made regarding the authenticity of the painting." The letter also stated:

> 2. In the letter, among other admissions you will make, you will admit that you did not perform a detailed examination of the painting and that your "opinion" was merely conjecture on your part.
> 3. You will agree to compensate Mr. Morton for the difference between what the painting sells for today, after we have tried to remove the cloud from its provenance, and what it could have sold for two years ago prior to your defamatory remarks about its authenticity.
> 4. Independently, you will reimburse Mr. Morton for the time, expense, embarrassment, grief and anxiety he has expended in trying to recover from your actions. The price: an additional $50,000 beyond the loss in value of the painting.

In conclusion, the letter stated: "We expect immediate cooperation on the drafting of your 'withdrawal of opinion' or litigation will be filed without any further discussion."

¶108 Following receipt of this letter, Seltzer sought and obtained information regarding GDC on the internet. As he testified:

> I discovered that they were a very big firm. The main office was in Southern California, but they had offices all over the world. There was in the neighborhood of 800 attorneys in this firm. And they touted themselves as being a pretty big, powerful and influential firm.

At this point, Seltzer testified, he began experiencing anxiety.

¶109  Seltzer also presented the Defendants' second threatening letter, which he received roughly two months later, and the Summons and Complaint which was served on him in July of 2002.  Upon reading the Complaint, Seltzer testified, he realized that the Defendants were formally seeking recovery in excess of $700,000.00 as compensation for the alleged loss.  As for the Defendants' additional claim for punitive damages, Seltzer testified that he understood the nature of punitive damages and knew that punitive awards "can amount to millions of dollars."  As for the Defendants' additional claim for attorney fees and costs, Seltzer testified: "I knew that if I had to pay attorney's fees, I knew that was going to be a huge sum of money because this—as big as this firm was, I was pretty sure that they charged a whole lot of money for their services."

¶110  At this point, Seltzer testified, he experienced "a state of panic" as a result of the financial implications posed by the lawsuit, as well as the potential impact on his reputation in the art community.  He testified: "I was fearful of losing everything that I had.  Everything that my wife and I had worked for 37 years to accumulate.  I mean, my home, my art studios, my cars.  All my personal belongings."  Seltzer further testified: "I was being wrongfully sued here and I was facing the prospect of financial disaster.  Bankruptcy."  Additionally, Seltzer testified: "With the comments they were making and the allegations here [in the Complaint], I felt that it was clearly gonna be a real problem for my reputation."

¶111 Seltzer then sought to protect himself.  Having resolved to maintain his professional integrity and not recant his opinion, Seltzer testified, he contacted a bankruptcy attorney in August of 2002 to determine whether he could protect some of his

assets in the event of an adverse judgment. Following a consultation with this attorney, Seltzer filed a "Declaration of Homestead" with the Clerk and Recorder so as to protect a portion of the equity he had built up in his home. As for the prospect of defending himself, Seltzer testified that he could not afford the expense of legal representation and he hoped Safeco Insurance would cover this cost through his homeowner's insurance policy. Accordingly, he wrote a letter to his Safeco insurance agent, enclosing a copy of the Summons and Complaint. With this letter, Seltzer asked the agent to contact Safeco to determine whether the homeowner's policy would provide coverage for defense costs. Safeco responded with a letter denying any coverage. In securing legal representation, Seltzer and his counsel in the underlying suit executed an agreement which obligated Seltzer to pay the costs and attorney fees incurred in the litigation, but also expressly acknowledged that he did not have sufficient funds to pay the hourly attorney fees at that time.

¶112 As noted, Seltzer testified that when he was served with the Summons and Complaint he initially experienced "a state of panic." Thereafter, Seltzer testified, he experienced a "high level of anxiety" which was accompanied by physical complications including irregular bowel function, perpetual upset stomach, and sleeplessness. He stated that he "was in a constant state of diarrhea or constipation" and further stated: "it was an all-consuming sort of a thing. I couldn't sleep at night. I lay awake til all hours of the night—thinking of this disaster that I'd got myself into and—my stomach was always upset." Seltzer also testified: "I think you can't appreciate what—just how debilitating this—this anxiety can be, unless you really experience it. Now—it saps your energy

level, it saps your vitality. I was tired all the time." Additionally, Seltzer testified that although he was absolutely confident the painting was an O. C. Seltzer, he feared that the Defendants might be able to manipulate the legal system to cause a failure of justice and bring financial ruin upon himself and his wife. Particularly, he feared that the Defendants might "come up with some bogus expert from somewhere that'll back them up in this claim that this is a Russell . . . I couldn't see any other way that they could possibly prosecute this case."

¶113   Seltzer's wife testified:

> He was absolutely a nervous wreck. Totally stressed out. We were being faced with bankruptcy. Financial ruin. He had extreme stomach problems. He couldn't sleep at night. He became very tense and irritable. He was consumed by this. Every minute he was consumed . . . he was confident he could prove that this was his grandfather's work. He never wavered on that. But there was a huge amount of pressure on him. And he became physically ill as a result of that.

She further testified that, as a result of his physical condition during the progression of the lawsuit, Seltzer had to use the bathroom at least four to five times per night on a regular basis.

¶114  In August of 2002, Seltzer's wife prompted him to consult with Dr. John T. Molloy, a physician in Great Falls who specializes in internal medicine and gastroenterology. Seltzer described his symptoms to Dr. Molloy and also explained the circumstances of the lawsuit. Dr. Molloy testified at trial that Seltzer "was lucid, and he was not suicidal at all, but he was under tremendous distress." Consequently, Dr. Molloy instructed Seltzer to take Paxil, a drug which Molloy stated is "a type of anti-depressant medication, but it has some features that are very helpful in anxiety disorders."

¶115 Seltzer took the Paxil for roughly three weeks; however, as he and his wife testified, it did not ameliorate his anxiety or his physical symptoms. Thereafter, Seltzer and his wife testified, his condition did not improve as the lawsuit progressed. Eventually, Seltzer's wife became concerned that Seltzer's physical problems could be caused by something more serious than the stress of the lawsuit, and she again prompted him to consult with Dr. Molloy. At an appointment in December of 2002, Seltzer described his continuing anxiety and physical symptoms, and explained how the lawsuit had progressed. At this point, as Dr. Molloy testified, he believed that Seltzer's irregular bowel function and other physical problems were caused by the stress of the lawsuit. However, Molloy nonetheless advised Seltzer to undergo a colonoscopy in order to rule out the possibility that his complications were a result of a physical disorder such as cancer or inflammatory bowel disease. In January of 2003, Dr. Molloy performed the procedure which revealed that Seltzer's colon was normal. Consequently, Dr. Molloy concluded that the stress resulting from the lawsuit, rather than any physical disorder, was the sole cause of Seltzer's symptoms.

¶116 At trial, Dr. Molloy testified that, in his opinion, Seltzer had experienced a serious and severe level of stress that caused his gastrointestinal complications. In explaining the basis for his opinion, Dr. Molloy testified that, through a neurologic mechanism, serious emotional distress can cause gastrointestinal problems such as those experienced by Seltzer. Molloy further explained, among other things, that the human intestinal tract reacts to stress by way of receptors in the brain which "can activate bowel function at an

inappropriate time and in an inappropriate way. And so . . . stress, through activity in the brain, causes the intestinal symptom."[10]

¶117 Consistent with the aforementioned evidence, as well as other evidence presented at trial, the District Court found:

> Prior to receiving threatening demands from the Mortons' attorney and becoming the subject of their lawsuit, Steve Seltzer was a healthy and well-adjusted person both physically and mentally. However, due to the nature of the factual and legal allegations asserted against him by the Mortons' lawsuit, the potential financial ruin, the potential professional and social disgrace, his awareness of the size, prominence, and resource advantages of the large and internationally prominent law firm prosecuting him, and his awareness of his own relative lack of resources to defend himself, Steve Seltzer suffered serious and severe emotional distress as a result of the Mortons' lawsuit against him. Seltzer also suffered from physical complications of his emotional distress, including but not limited to intestinal and bowel problems requiring medical care.

On appeal, the Defendants provide no explanation as to why the evidence noted above, or any other evidence presented at trial, is not substantial and credible—i.e., why a reasonable mind could not accept this evidence as adequate to support the jury's determination of the extent of damage Seltzer suffered. Rather, the Defendants simply assert that the award is "grossly excessive" because it is larger than awards upheld in other cases. As noted above, we reject this reasoning because each case must be decided on its own merits and because it is not our job to ensure conformity among compensatory verdicts in different cases.

---

[10] The Defendants have not disputed that a fear of financial ruin and reputational damage can in fact cause physical complications such as Seltzer experienced. Nor have the Defendants attempted to present evidence demonstrating that Seltzer's physical complications could have been caused by something other than the anxiety resulting from the lawsuit.

¶118 As a remedy, Defendants request that the compensatory award be "set aside or significantly reduced." Yet, the Defendants offer no authority or other guidance as to how this Court could legitimately determine a reduction of the award. Nor do the Defendants' speculative assertions noted above—i.e., that the compensatory award was meant to punish the Defendants and was not based on the actual harm to Seltzer—provide any justification for this Court to take the extraordinary step of setting aside the award altogether. In fact, reducing or setting aside the compensatory award would require us to usurp the jury's role—in other words, we would have to weigh all the evidence presented at trial, resolve any conflicts in the evidence, judge the credibility of the witnesses based on the cold transcripts, and ultimately make factual findings. However, doing so would be entirely inconsistent with the limited scope of proper appellate review, as these tasks are properly left to the jury. *Satterfield*, ¶ 23; *Onstad*, ¶ 50; *Smith*, ¶ 19; *Kneeland*, ¶¶ 45, 53; *Sandman*, ¶ 45.

¶119 Viewing the evidence in the light most favorable to Seltzer and drawing all reasonable inferences in his favor, as we must, we conclude that a reasonable juror could accept this evidence as adequately establishing that Seltzer reasonably incurred over $45,000.00 in legal expenses while defending himself; that he suffered serious damage to his personal and professional reputation; and that he suffered serious and severe emotional distress[11] which manifested itself through significant physical complications

---

[11] Relying on *Sacco v. High Country Independent Press, Inc.*, 271 Mont. 209, 896 P.2d 411 (1995), the District Court instructed the jury that, in order to recover damages for emotional distress, Seltzer was required to prove that he suffered serious or severe emotional distress, defined as being "so severe that no reasonable person could be expected to endure it." However,

requiring medical care. We also conclude that a reasonable juror could accept this evidence of legal expenses, reputational damage, and emotional distress, as adequate to establish damages in the amount of $1.1 million resulting from the Defendants' conduct. Accordingly, we hold that the jury's award of compensatory damages is supported by substantial credible evidence.

¶120 In analyzing the compensatory award in its post-verdict order, beyond the findings noted above, the District Court concluded in summary:

> In this case, as a result of Defendants' tortious conduct, Seltzer reasonably incurred substantial attorney fees and costs in his defense of the underlying lawsuit. Seltzer also suffered serious or severe emotional distress and damage to his personal and professional reputation for integrity and competence as a result of Defendants' conduct. Substantial credible evidence supports the jury's compensatory damages award of $1.1 million for reputation damages, emotional distress damages, and economic damages (attorney fees and costs) incurred as a result of Defendants' commencement and prosecution of the underlying lawsuit. The jury's compensatory damages award fully and fairly compensated Seltzer for all damages suffered as a result of Defendants' tortious conduct.

We hold that the court's conclusion is consistent with the evidence of record and we will therefore not interfere with the jury's award of compensatory damages.

¶121 **(6) Did the District Court err in not applying the current statutory cap on punitive damages?**

¶122 The Montana Legislature has limited punitive damages awards by enacting § 27-1-220(3), MCA, which provides: "An award for punitive damages may not exceed $10 million or 3% of a defendant's net worth, whichever is less. This subsection does not

---

this language from *Sacco* does not define the standard for proving emotional distress damages incurred pursuant to torts in general; rather, it defines an element of proof necessary to maintain an independent action for intentional or negligent infliction of emotional distress. *Sacco*, 271 Mont. at 234-37, 896 P.2d at 426-28.

limit punitive damages that may be awarded in class action lawsuits." This statute became effective on October 1, 2003, nearly eight months after Seltzer filed the instant lawsuit. After the jury rendered its punitive damages verdict, the Defendants argued that § 27-1-220(3), MCA, requires a reduction of the award. The District Court concluded that this statutory cap is not applicable to Seltzer's case. We review this conclusion de novo to determine whether the District Court properly interpreted the law. *Gomez v. State*, 1999 MT 67, ¶ 7, 293 Mont. 531, ¶ 7, 975 P.2d 1258, ¶ 7.

¶123 In *Dvorak v. Huntley Project Irrigation District*, 196 Mont. 167, 639 P.2d 62, (1981), the plaintiffs filed a lawsuit seeking compensatory and punitive damages against a government entity, as well as two of its employees, after losing farm crops because the defendants failed to provide water to the plaintiffs' farm. *Dvorak*, 196 Mont. at 168-69, 639 P.2d at 63. Following trial, "the jury returned a verdict for plaintiffs in the amount of $5,000 compensatory damages and $40,000 punitive damages against each of the three defendants." *Dvorak*, 196 Mont. at 169, 639 P.2d at 63. On appeal, this Court considered whether a statute prohibiting punitive damages awards against government entities was applicable to a cause of action that arose before the statute was enacted. *Dvorak*, 196 Mont. at 174-75, 639 P.2d at 66. Article II, Section 18, of the 1972 Montana Constitution provides: "The state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property, except as may be specifically provided by law by a 2/3 vote of each house of the legislature." Pursuant to Section 18, the Legislature enacted § 2-9-105, MCA, which provides: "The state and other governmental entities are immune from exemplary and

punitive damages." In resolving the appeal, this Court observed that the plaintiffs' cause of action arose in 1974, while § 2-9-105, MCA, was not enacted until 1977. *Dvorak*, 196 Mont. at 174, 639 P.2d at 66. Even though § 2-9-105, MCA, was in effect when the jury rendered its verdict in 1980, this Court held that the statute was not applicable to the case because it was enacted after the plaintiffs' cause of action arose. *Dvorak*, 196 Mont. at 169, 174-75, 639 P.2d at 63, 66.

¶124 The propriety of this Court's decision in *Dvorak* is reflected in *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032 (1991), where the United States Supreme Court reviewed the decision of the Alabama Supreme Court, *Pacific Mutual Life Ins. Co. v. Haslip*, 553 So.2d 537 (Ala. 1989), that affirmed a jury verdict of $200,000.00 in compensatory damages and $840,000.00 in punitive damages.[12] In that case, the plaintiff filed suit in 1982, *Haslip*, 499 U.S. at 5, 111 S.Ct. at 1036, and following trial the jury rendered its verdict on August 7, 1987, *Haslip*, 553 So.2d at 539. Nearly two months before the verdict was rendered, on June 11, 1987, a statutory cap on punitive damages went into effect in Alabama. *Haslip*, 499 U.S. at 20, n.9, 111 S.Ct. at 1044, n.9. In its decision, the United States Supreme Court recognized that "[t]he Alabama Legislature recently enacted a statute that places a $250,000 limit on punitive damages in most cases." *Haslip*, 499 U.S. at 20, n.9, 111 S.Ct. at 1044, n.9. However, the Supreme Court conducted its analysis of the punitive damages award without regard to this statutory cap,

---

[12] Although the jury rendered a general verdict awarding $1,040,000.00 in damages to the plaintiff, the United States Supreme Court viewed the verdict, based on the record, as containing a punitive element of not less than $840,000.00. *Haslip*, 499 U.S. at 7, n.2, 111 S.Ct. at 1037, n.2.

stating: "The legislation, however, became effective . . . after the cause of action in the present case arose and the complaint was filed." *Haslip*, 499 U.S. at 20, n.9, 111 S.Ct. at 1044, n.9.

¶125   Here, in its post-verdict order reviewing the punitive damages awards, the District Court relied on *Dvorak* in concluding that "except as otherwise expressly provided by the Legislature, a new law limiting recovery of punitive damages does not apply to punitive damages awarded on a claim that accrued prior to the effective date of the statute."[13] Thus, observing that Seltzer's tort claims accrued prior to the effective date of § 27-1-220(3), MCA, the District Court determined that the statutory cap does not require a reduction of the jury's punitive damages awards against the Defendants.  We agree.

¶126   After initiating their tortious conduct in 2002, the Defendants finally agreed to dismissal of the underlying suit with prejudice on February 6, 2003.  Thus, Seltzer's cause of action accrued well before the effective date of § 27-1-220(3), MCA, i.e., October 1, 2003.  *Gomez*, ¶¶ 9, 10 (pursuant to § 27-2-102(1)(a), MCA, a tort claim or cause of action accrues when all elements of the claim or cause exist or have occurred, the right to maintain an action on the claim or cause is complete, and a court or other

---

[13]   The District Court also cited to *Jacques v. Mont. Natl. Guard*, 199 Mont. 493, 649 P.2d 1319 (1982).  In that case, a severely injured plaintiff brought a suit against the Montana National Guard and the State of Montana, and the jury rendered a verdict in favor of the plaintiff for $1,390,000.00. *Jacques*, 199 Mont. at 495, 649 P.2d at 1320.  On appeal, the defendants sought a reduction of the jury's verdict pursuant to § 2-9-104, MCA, which provided limits on governmental liability in tort actions at the time the trial occurred. *Jacques*, 199 Mont. at 495, 506, 649 P.2d at 1321, 1326.  This Court determined that § 2-9-104, MCA, was not applicable to the case because it went into effect after the plaintiff's cause of action accrued. *Jacques*, 199 Mont. at 506-07, 649 P.2d at 1326.  In the decision, this Court concluded that the defendants' theory had already been "disposed of in *Dvorak*" and held that "the measure of damage is governed by law in effect on the date of injury." *Jacques*, 199 Mont. at 506-07, 649 P.2d at 1326.

62

agency is authorized to accept jurisdiction of the action); *Plouffe*, ¶ 16 (before an action for malicious prosecution may be maintained, the lawsuit alleged to have been improper must be terminated). Accordingly, just as this Court held in *Dvorak* that the 1977 statute prohibiting punitive damages against government entities was not applicable to a cause of action that arose in 1974, we also hold that § 27-1-220(3), MCA, which went into effect on October 1, 2003, is not applicable to this case because Seltzer's cause of action accrued before that date. Thus, we hold that the District Court did not err, and that § 27-1-220(3), MCA, does not require a reduction of the jury's punitive damages award against the Defendants.

¶127 **(7) Did the District Court err in following Montana statutory law regarding evidence of a defendant's financial condition?**

¶128 Montana statutory law prohibits the admission of evidence of a defendant's "financial affairs, financial condition, and net worth" (hereinafter "financial condition") at trial for the purpose of determining whether the defendant is liable for punitive damages. Section 27-1-221(7)(a), MCA. However, the same statute also provides that evidence of a defendant's financial condition must be considered during subsequent proceedings wherein the jury determines the appropriate amount of punitive damages to assess. Section 27-1-221(7)(a), MCA. Specifically, this statute provides:

> Evidence regarding a defendant's financial affairs, financial condition, and net worth is not admissible in a trial to determine whether a defendant is liable for punitive damages. When the jury returns a verdict finding a defendant liable for punitive damages, the amount of punitive damages must then be determined by the jury in an immediate, separate proceeding and be submitted to the judge for review as provided in subsection (7)(c). In the separate proceeding to determine the amount of punitive damages to

be awarded, the defendant's financial affairs, financial condition, and net worth *must* be considered.

Section 27-1-221(7)(a), MCA (emphasis added).

¶129 The District Court followed the statutory mandate by allowing evidence of the Defendants' financial condition only during the punitive damages proceedings, and by instructing the jury to consider this evidence as one factor in assessing the amount of punitive damages. Yet, the Defendants argue that the District Court "erred by admitting evidence of Defendants' wealth and by instructing the jury to consider wealth in determining the amount of punitive damages." In support of this argument, Defendants suggest that the final sentence of § 27-1-221(7)(a), MCA, which requires consideration of the defendant's financial condition, conflicts with the United States Supreme Court's decision in *State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513 (2003).

¶130 However, *Campbell* does not hold that juries may not consider a defendant's financial condition as a factor in determining an appropriate amount of punitive damages. Rather, the decision criticizes the Utah Supreme Court's reliance on several factors, including out-of-state conduct and "State Farm's enormous wealth," as justification for a punitive award that was presumptively disproportionate given the facts of the case. *Campbell*, 538 U.S. at 426-27, 123 S.Ct. at 1524-25. Particularly, the Supreme Court stated that "[i]n the context of this case"—i.e., where the harm arose from a transaction in the economic realm, the compensatory award was "substantial," the victims were not subjected to physical injury, and the victims suffered only minor economic injuries—

there must be a presumption against a punitive award that is 145 times larger than the compensatory award. *Campbell*, 538 U.S. at 426, 123 S.Ct. at 1524-25. Having identified this presumption, the Supreme Court rejected the Utah Supreme Court's reliance on several factors, including "State Farm's enormous wealth," as justification for the punitive verdict, stating: "The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." *Campbell*, 538 U.S. at 427, 123 S.Ct. at 1525.

¶131 The *Campbell* decision then notes that consideration of a defendant's wealth as a factor in determining the amount of punitive damages is not "unlawful or inappropriate." *Campbell*, 538 U.S. at 427-28, 123 S.Ct. at 1525.[14] Simply put, *Campbell* does not support the Defendants' argument.

¶132 Of course, a defendant's financial condition cannot be a rational basis for determining whether punitive damages should be assessed in the first place, nor can it rationally be the sole basis for determining the amount of punitive damages. However, a defendant's financial condition is logically one of the essential factors to consider in determining an amount of punitive damages that will appropriately accomplish the goals of punishment and deterrence. A punitive sanction of $1,000.00 for reprehensible conduct may be sufficient to deter an individual of modest means from subsequently engaging in similar conduct, while that sanction could be utterly ineffective to deter an individual with vast financial resources from engaging in the same conduct. Similarly, a

---

[14] Indeed, as Justice Stevens observed in *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 113 S.Ct. 2711 (1993), where the defendant challenged the admission of evidence of its net worth: "Under well-settled law, however, factors such as [net worth] are typically considered in assessing punitive damages." *TXO*, 509 U.S. at 462, n.28, 113 S.Ct. at 2722, n.28 (plurality opinion).

punitive sanction of $1,000.00 may constitute a significant level of punishment for an individual of modest means, but it could amount to an inconsequential penalty for an individual with vast financial resources.[15]  Conversely, a $100,000.00 punitive sanction may sufficiently punish and deter a wealthy individual who has engaged in reprehensible conduct; yet, if that same sanction would bankrupt an individual of modest means who has engaged in the same conduct, it could therefore constitute an excessive penalty.

¶133   As the California Supreme Court has observed, in conjunction with its holding that "the defendant's financial condition is an essential factor in fixing an amount" that serves the goals of punitive damages:

> Obviously, the function of deterrence will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. Punitive damage awards should not be a routine cost of doing business that an industry can simply pass on to its customers through price increases, while continuing the conduct the law proscribes.  On the other hand, the purpose of punitive damages is not served by financially destroying a defendant.

*Simon v. San Paolo U.S. Holding Co., Inc.*, 113 P.3d 63, 78-79 (Cal. 2005) (citations, internal quotation marks, and alterations omitted).[16]

¶134   The purpose of a punitive damages verdict is to have an impact on the defendant in the form of punishment and deterrence.  *Campbell*, 538 U.S. at 416, 123 S.Ct. at 1519. Without knowledge of the defendant's financial condition, the jury cannot know what

---

[15]   Indeed, "what is ruin to one man's fortune, may be a matter of indifference to another's." William Blackstone, *Commentaries* vol. 4, *371.
[16]   The last sentence of this quotation is applicable here given the facts of this case.  That is not to say, however, that it would apply with equal force in another case where the defendant's conduct is exceptionally heinous and the cause of great and irreparable damage.  In any event, the current statutory cap, § 27-1-220(3), MCA, would prevent a financially devastating award of punitive damages except in class action lawsuits.

impact any particular punitive damages verdict will have. Needless to say, this would seriously hinder the jury's ability to tailor a punitive verdict to a particular defendant. In this scenario, speculation regarding the defendant's financial condition would be required to determine an amount of punitive damages that would appropriately punish and provide a sufficient deterrent effect. Engaging in such speculation, a jury might make erroneous assumptions based on evidence at trial that may or may not have any relation to the defendant's actual financial condition. And, believing that the defendant has vast financial resources, the jury might render a substantial punitive verdict when in fact the defendant is of modest means and would be appropriately punished and sufficiently deterred by a relatively minor penalty. Indeed, in some punitive damages cases the defendants have complained to this Court that evidence of their financial condition was *not* presented at trial, thus emphasizing the fact that such evidence actually serves to protect defendants from unnecessarily high awards by allowing the jury to know what impact a particular punitive award will have on the defendant's finances. *See Cartwright v. Equitable Life Assurance*, 276 Mont. 1, 37, 914 P.2d 976, 998 (1996); *Gurnsey v. Conklin Co., Inc.*, 230 Mont. 42, 54-55, 751 P.2d 151, 158 (1988).

¶135 While Defendants here disapprove of the fact that evidence of a tortfeasor's financial condition can lead to large punitive verdicts, they apparently do not recognize the critical role that such evidence plays in *constraining* punitive verdicts. As we have observed, a defendant's financial condition may be the primary reason *precluding* a substantial punitive damages verdict. *Cartwright*, 276 Mont. at 44, 914 P.2d at 1002. Nonetheless, the Defendants here would have juries render punitive damages verdicts

67

without reference to the specific financial impact on the culpable party. The speculation that would be engendered by this approach would create a substantial risk of unjust results in the form of punitive damages verdicts that are either inappropriately small or unjustifiably large. As such, the logic and practicality of considering the defendant's financial condition is clearly evident—it is, in fact, the only way to make an informed decision which ensures that the punitive damages award is properly tailored so as not to be too harsh or too lenient.

¶136 We see nothing in *Campbell* that invalidates § 27-1-221(7)(a), MCA. The California Supreme Court has reached the same conclusion, determining that subsequent to the *Campbell* decision "the defendant's financial condition remains a legitimate consideration in setting punitive damages." *Simon*, 113 P.3d at 79 (citing *Campbell*, 538 U.S. at 427-28, 123 S.Ct. at 1525, for its statement that consideration of a defendant's wealth is not unlawful or inappropriate). Accordingly, we reject the Defendants' argument and hold that the District Court did not err by admitting evidence of the Defendants' financial condition during the punitive damages proceedings and instructing the jury to consider that evidence in determining the amount of punitive damages.

¶137 **(8) Is GDC entitled to judgment as a matter of law on the punitive damages verdict?**

¶138 GDC argues that it is entitled to judgment as a matter of law on the punitive damages verdict because Seltzer failed to present evidence sufficient to demonstrate that GDC could be held liable for Gladwell's actions. In support of this argument, GDC asserts that Seltzer failed to demonstrate that a GDC managing partner knew of

Gladwell's allegedly malicious conduct and intended to ratify it.[17]  Yet, GDC does not dispute that it was properly held liable for compensatory damages based on the conduct of its attorneys.

¶139   GDC designated Gladwell as its corporate representative at trial.  Accordingly, the District Court instructed the jury that GDC "has authorized Dennis Gladwell to testify on its behalf, and thus, the testimony of Dennis Gladwell is the testimony of Defendant Gibson, Dunn & Crutcher, LLP."  During the settling of instructions, GDC expressly stated to the District Court that it had no objection to this instruction.

¶140   Gladwell testified that because he occupied "of counsel" status with GDC, as a former partner, the firm's internal policy required him to obtain approval from a GDC partner to file suit against Seltzer.  Gladwell then testified that he obtained approval from GDC partner William Claster to file the suit under the banner of GDC.  Yet, Gladwell also testified that while he technically occupied "of counsel" status, he "was still acting in the capacity of a partner."  Additionally, in accordance with the Defendants' insistence at trial that the suit against Seltzer was proper, Gladwell freely admitted that GDC "totally approved all of [his] conduct" prior to the filing of the Complaint and up to the dismissal.

¶141   Seltzer presented the "New Matter Memorandum" which GDC generated, in accordance with its internal protocol, in initiating the suit against Seltzer.  This document

---

[17]  Defendants further assert, in conclusory fashion, that they are entitled to judgment because the verdict form submitted to the jury was improperly structured in that it linked GDC and Gladwell, as principle and agent, for purposes of determining liability.  We will not address this cursory argument because the Defendants do not support it with citation to legal authority as required by M. R. App. P. 23(a)(4).  *State v. Buck*, 2006 MT 81, ¶ 28, 331 Mont. 517, ¶ 28, 134 P.3d 53, ¶ 28.

explicitly states that William Claster, as a GDC partner, was the "partner in charge" of the case and that he approved the "engagement." It also specifies Erin Alexander as a GDC attorney assigned to work on the case and states that the firm intended to seek "an injunction and damages" against Seltzer. Further, this document indicates that GDC conducted a review of its records to ensure that no conflicts of interest existed.

¶142 Seltzer also presented an email correspondence between Gladwell and Claster wherein Gladwell stated that the lawsuit would include, inter alia, a defamation claim, and that "all billing will be through the firm as per normal protocol." Gladwell also noted in the email that Erin Alexander would be assisting with the case. Further, Seltzer presented evidence that Jeffery Thomas, the managing partner of GDC's office in Irvine, California, knew of and was involved in the case. Not only did Gladwell testify that Thomas "was aware of the lawsuit," but Seltzer presented an email correspondence between Thomas and Erin Alexander wherein Thomas stated: "this is a regular firm case, despite Dennis' [i.e., Dennis Gladwell's] involvement. My secretary has the currently pending letter; please come get it and send it out." Finally, Seltzer presented the Complaint GDC filed in the underlying suit, which lists William Claster, Erin Alexander, and Gladwell as GDC counsel of record in the case.

¶143 All of the foregoing evidence was admitted at trial and went uncontroverted by GDC. As the District Court stated in its post-verdict order reviewing punitive damages, GDC "presented no evidence at trial that Dennis Gladwell was not its authorized agent at all times pertinent." Further, the evidence at trial was consistent with the District Court's conclusions, stated in its post-verdict order: (1) "the evidence established unequivocally

70

that GD&C, by and through William Claster, expressly authorized Gladwell to prosecute the underlying lawsuit against Seltzer on behalf of and under the colors of GD&C"; and (2) GDC "by and through its authorized agents William Claster and Erin Alexander, also voluntarily provided substantial assistance or encouragement to Gladwell and Morton through the initial authorization by Mr. Claster, the litigation support of Erin Alexander, and the authorized use of the GD&C corporate name, resources, and prestige." Notwithstanding this overwhelming and uncontroverted evidence, GDC now argues that Seltzer failed to present evidence sufficient to demonstrate that GDC could be held liable for Gladwell's actions.

¶144 The District Court instructed the jury that in certain circumstances corporate entities are liable to third parties for wrongful acts committed by its agents or employees. The court further instructed the jury that GDC was liable for the actions of Gladwell and Erin Alexander. During the settling of instructions, the Defendants expressly stated to the court that they had no objection to these particular instructions. "We have long adhered to the rule that an instruction given without an objection becomes the law of the case." *DeBruycker v. Guaranty Natl. Ins. Co.*, 266 Mont. 294, 301, 880 P.2d 819, 823 (1994) (citing *Nicholson v. United Pacific Ins. Co.*, 219 Mont. 32, 38, 710 P.2d 1342, 1346 (1985)) (internal quotation marks omitted). Thus, because GDC expressly acquiesced to the instruction which stated that the firm was liable for Gladwell's actions, that instruction became the law of the case.

¶145 "[T]he Due Process Clause prohibits a State from punishing an individual without first providing that individual with an opportunity to present every available defense."

71

*Philip Morris USA v. Williams*, No. 05-1256, slip op. at 5 (U.S. Feb. 20, 2007) (citation and internal quotation marks omitted). At trial, GDC had the opportunity to argue that it should not be held liable for the actions of its attorneys. However, GDC instead argued that the suit against Seltzer was proper and expressly acquiesced to the giving of an instruction that the firm was liable for the actions of its attorneys. As such, this Court will not now consider GDC's argument that Seltzer failed to present evidence sufficient to demonstrate that the firm could be held liable for Gladwell's actions because that contention contradicts the law of the case. Accordingly, we conclude that GDC is not entitled to judgment as a matter of law on the punitive damages verdict.

¶146 **(9) Did the District Court err in applying federal due process law to the jury's punitive damages award?**

¶147 As noted above, the jury assessed punitive damages in the amount of $100,000.00 against Morton, $150,000.00 against Gladwell, and $20 million against GDC. In reviewing the jury's assessments pursuant to federal due process law, the District Court concluded that the verdicts against Morton and Gladwell were not excessive, and that the verdict against GDC must be reduced to $9.9 million. Both Seltzer and GDC challenge the latter determination.

¶148 The imposition of punitive damages has " 'long been a part of traditional state tort law.' " *Haslip*, 499 U.S. at 15, 111 S.Ct. at 1041. "Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568, 116

S.Ct. 1589, 1595 (1996).[18]   This stands in contrast to the purpose of compensatory damages, which is to redress the concrete loss that a plaintiff has suffered by reason of a defendant's wrongful conduct.  *State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S.Ct. 1513, 1519 (2003).

¶149   The states possess "broad discretion" regarding the imposition of punitive damages.  *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 433, 121 S.Ct. 1678, 1683 (2001).   However, "there are procedural and substantive constitutional limitations on these awards.  The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor."  *Campbell*, 538 U.S. at 416, 123 S.Ct. at 1519-20 (internal citations omitted). When an award of punitive damages can fairly be categorized as "grossly excessive" in relation to a state's interests in punishment and deterrence, it enters "the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment."  *Gore*, 517 U.S. at 568, 116 S.Ct. at 1595.   "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Campbell*, 538 U.S. at 417, 123 S.Ct. at 1520.

¶150   The exact meaning of the concept of "gross excessiveness," as with the concepts of "reasonable suspicion" and "probable cause," "cannot be articulated with precision; they are 'fluid concepts that take their substantive content from the particular contexts in

---

[18]   Punitive damages awards operate as "private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence"; they have been described as "quasi-criminal" punishment and as "an expression of [a jury's] moral condemnation." *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432, 121 S.Ct. 1678, 1683 (2001) (internal quotations marks omitted).

which the standards are being assessed.' " *Cooper Industries*, 532 U.S. at 436, 121 S.Ct. at 1685. Thus, as a substantive limit on the amount of punitive damages that may be imposed, "the relevant constitutional line is inherently imprecise, rather than one marked by a simple mathematical formula." *Cooper Industries*, 532 U.S. at 434-35, 121 S.Ct. at 1684 (internal citations and quotation marks omitted).

¶151 In determining whether that line has been crossed, we must consider three "guideposts" which the United States Supreme Court announced in *Gore*: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity, or ratio, between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Campbell*, 538 U.S. at 418, 123 S.Ct. at 1520.[19]

¶152 We must conduct de novo review of the District Court's application of the *Gore* guideposts to the jury's punitive damages verdict. *Cooper Industries*, 532 U.S. at 436,

---

[19] Four Justices dissented in *Gore*. Justice Ginsburg stated in her dissent: "The decision leads us further into territory traditionally within the States' domain . . . . The Court is not well equipped for this mission. . . . It has only a vague concept of substantive due process . . . ." *Gore*, 517 U.S. at 612-13, 116 S.Ct. at 1616-17 (Ginsburg, J., joined by Rehnquist, C. J., dissenting). Justice Scalia stated in his dissent: (1) "[T]he Court's activities in this area are an unjustified incursion into the province of state governments."; (2) "There is no precedential warrant for giving our judgment priority over the judgment of state courts and juries on this matter."; (3) "Of course it will not be easy for the States to comply with this new federal law of damages, no matter how willing they are to do so. In truth, the 'guideposts' mark a road to nowhere; they provide no real guidance at all." *Gore*, 517 U.S. at 598-605, 116 S.Ct. at 1610-13 (Scalia, J., joined by Thomas, J., dissenting). In applying federal precedent in this case, we have come to appreciate the dissenting statements regarding the vague nature of the *Gore* guideposts. Of course, we are nonetheless bound to follow federal precedent here, and we have endeavored to do so meticulously.

121 S.Ct. at 1685-86.[20] As for the resolution of factual issues, we defer to the District Court's findings of fact unless they are clearly erroneous. *Cooper Industries*, 532 U.S. at 440, n.14, 121 S.Ct. at 1688, n.14. Here, pursuant to § 27-1-221(7)(c), MCA, the District Court issued extensive and detailed findings of fact in reviewing the verdict. On appeal, no litigant argues that any of these findings are clearly erroneous. Thus, we defer to the District Court's factual findings, which are entirely consistent with the jury's verdict.

¶153 As for the application of federal due process jurisprudence, Seltzer argues that the *Gore* guideposts do not require reducing the jury's punitive verdict against GDC, while GDC argues these guideposts mandate that the punitive verdict not exceed the amount of compensatory damages. Before reaching the federal due process issue, however, we address several preliminary arguments and note relevant aspects of Montana law.

**Preliminary Arguments**

¶154 First, Seltzer argues that the Defendants have waived their opportunity to challenge the punitive damages verdict on federal constitutional grounds because they failed to raise this issue before the jury rendered its decision. In support of this argument, Seltzer cites *Jerome v. Jerome*, 175 Mont. 429, 431, 574 P.2d 997, 998 (1978), wherein this Court stated: "Constitutional issues are waived if not raised at the earliest opportunity." We do not find *Jerome* applicable here. As the Second Circuit Court of

---

[20] In establishing this rule, the United States Supreme Court explained that independent review of the *Gore* guideposts is "necessary if appellate courts are to maintain control of, and to clarify, the legal principles"; these guideposts "will acquire more meaningful content through case-by-case application at the appellate level"; and "*de novo* review tends to unify precedent and stabilize the law." *Cooper Industries*, 532 U.S. at 436, 121 S.Ct. at 1685 (internal quotations marks omitted).

Appeals has noted, the propriety of the size of a punitive damages verdict is an issue that becomes ripe after the verdict is entered. *Local Union No. 38 v. Pelella*, 350 F.3d 73, 89 (2nd Cir. 2003). Accordingly, a constitutional challenge regarding the size of a punitive verdict may be raised by way of post-verdict motion, just as the Defendants did here. Thus, we reject Seltzer's argument.

¶155 Second, Seltzer contends that this Court should not review the jury's punitive damages verdict against GDC pursuant to the *Gore* guideposts. The record indicates that GDC maintains an insurance policy with Lloyd's of London which provides $160 million in coverage for punitive damages liability. As the substantive due process analysis is premised on an actual deprivation of property, Seltzer argues, that analysis is not applicable here because GDC's punitive damages insurance policy guarantees that the firm will not suffer any deprivation of its property.

¶156 We note that the United States Supreme Court's due process jurisprudence in this area speaks of both the "imposition" of punitive damages and the "deprivation" of property. *See Campbell*, 538 U.S. at 416-17, 123 S.Ct. at 1519-20 (the Due Process Clause "prohibits the *imposition* of grossly excessive or arbitrary punishments on a tortfeasor"; "This constitutional concern, itself harkening back to the Magna Carta, arises out of the basic unfairness of *depriving* citizens of life, liberty, or property, through the application, not of law and legal processes, but of arbitrary coercion.") (emphases added) (internal quotation marks omitted).

¶157 Seltzer cites no authority directly holding that punitive damages insurance coverage renders the due process analysis inapplicable. He does, however, analyze

76

various United States Supreme Court precedents that can be read to support this conclusion. Seltzer's argument is not without merit, as there appears to be a legitimate distinction between the "imposition" of a punitive damages verdict and the "deprivation" of property—i.e., where the defendant lacks insurance coverage for punitive damages, the imposition of a punitive damages sanction translates directly into a deprivation of property; conversely, as Seltzer appropriately observes, the defendant suffers no deprivation of property when its insurer covers the obligation to pay punitive damages. Yet, while it is true that GDC will not be deprived of its property *if* Lloyd's of London covers the punitive damages obligation in this case, we cannot conclude that the absence of a "deprivation" of property dispels the constitutional concern with the "imposition" of the punitive damages verdict against GDC. Because the United States Supreme Court's current jurisprudence appears to be equally concerned with the "imposition" of a punitive damages verdict and the "deprivation" of property, we conclude that the *Gore* analysis is triggered whenever a punitive damages verdict is challenged as unconstitutionally excessive. Accordingly, until we are presented with persuasive arguments to the contrary, or until the Supreme Court holds otherwise, we will apply the due process guideposts of *Gore* despite the existence of punitive damages insurance.

¶158 Finally, the Defendants' briefing focuses almost exclusively on the amount of punitive damages assessed against GDC, presenting virtually no argument regarding the amount of punitive damages assessed separately against Morton and Gladwell. Defendants simply claim that these latter two punitive verdicts are unconstitutionally excessive because Morton and Gladwell did not engage in violent conduct and because

77

there is no evidence that they have previously engaged in conduct similar to that at issue here. Other than stating these two facts, which constitute only a minor portion of the circumstances here, the Defendants provide no analysis regarding *Gore*'s reprehensibility guidepost. Moreover, Defendants utterly fail to address the other two *Gore* guideposts with respect to these two punitive verdicts. Although our review of a trial court's application of these guideposts is de novo, *Cooper Industries*, 532 U.S. at 436, 121 S.Ct. at 1685-86, we only conduct that review when the issue is properly presented on appeal. We are not obligated to develop legal analysis that may lend support to a party's position. *In re Estate of Bayers*, 1999 MT 154, ¶ 19, 295 Mont. 89, ¶ 19, 983 P.2d 339, ¶ 19. Accordingly, because of the Defendants' failure to provide analysis in challenging the amount of the punitive damages verdicts against Morton and Gladwell, as is required by M. R. App. P. 23(a)(4), we will not consider the issue, *State v. Ferguson*, 2005 MT 343, ¶ 38, 330 Mont. 103, ¶ 38, 126 P.3d 463, ¶ 38, and we simply affirm those awards.

**Montana Statutory Framework**

¶159 As a final step before analyzing the *Gore* guideposts, we note aspects of Montana's legal framework which governed the trial in this case. Our statutory law addresses punitive damages claims in detail, providing both procedural and substantive requirements. For example, while a claim for compensatory damages must be proven by a preponderance of the evidence, *Holenstein v. Andrews*, 166 Mont. 60, 64, 530 P.2d 476, 478 (1975), the standard of proof governing a claim for punitive damages is more stringent under our statutory law:

78

> All elements of [a] claim for punitive damages must be proved by clear and convincing evidence. Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence. It is more than a preponderance of evidence but less than beyond a reasonable doubt.

Section 27-1-221(5), MCA. In *Haslip*, the United States Supreme Court concluded that the Due Process Clause does not require that punitive damages claims be proven by a standard higher than "preponderance of the evidence," such as "clear and convincing evidence" or "beyond a reasonable doubt." *Haslip*, 499 U.S. at 23, n.11, 111 S.Ct. at 1046, n.11. Thus, Montana's standard of proof affords defendants with a level of protection that actually exceeds the federal constitutional requirement.

¶160 By statute, punitive damages may only be awarded "when the defendant has been found guilty of actual fraud or actual malice." Section 27-1-221(1), MCA. Actual malice is statutorily defined as follows:

> A defendant is guilty of actual malice if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and:
> (a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or
> (b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.

Section 27-1-221(2), MCA.

¶161 In the first phase of trial in this case, where the jury had to determine, inter alia, whether the Defendants should be held liable for punitive damages, the District Court explained the differing purposes of compensatory and punitive damages with the following instruction:

In contrast to compensatory damages which have the purpose to compensate a plaintiff for actual injury or loss caused by a defendant's wrongful conduct, punitive damages are a remedy which has the purpose to punish a defendant for wrongful conduct, deter the defendant from similar wrongful conduct in the future, and deter others from engaging in similar conduct.

Additionally, in accordance with the above statutory provisions, the jury was instructed regarding the "clear and convincing evidence" standard of proof and the requirement to prove actual malice.[21]

¶162   In the second phase of trial, the District Court instructed the jury:

You have previously determined that, in addition to compensatory damages for actual injury, the defendant is also liable for punitive damages for engaging in malicious conduct that resulted in actual damage to the plaintiff.  Accordingly, you must now determine what amount, if any, is necessary to punish the defendant for the wrongful conduct, deter the defendant from similar wrongful conduct in the future, and deter others from engaging in similar conduct.

The court then instructed the jury to consider, in assessing the amount of punitive damages, a number of factors, including the nature and extent of the Defendants' misconduct; the reprehensibility of this conduct; the Defendants' intent in engaging in the misconduct; the likelihood of recidivism; the Defendants' financial affairs, financial condition, and net worth; the total amount of compensatory damages previously awarded to Seltzer; any circumstances weighing in favor of reducing punitive damages; and "whether the amount of your punitive damage award is reasonably and fairly related to the nature, extent, and reprehensibility of the defendant's conduct."

---

[21]   The instructions contained the definitions of "clear and convincing evidence" and "actual malice" as detailed in § 27-1-221, MCA, and also noted the distinction between the latter definition and the definition of "malice" used for the purposes of Seltzer's malicious prosecution claim.

¶163 We note that these instructions are similar to those approved by the United States Supreme Court in *Haslip*, where the defendant challenged an Alabama punitive damages verdict which it characterized as "the product of unbridled jury discretion." *Haslip*, 499 U.S. at 7, 111 S.Ct. at 1037. The jury instructions in that case explained that the imposition of punitive damages was not compulsory; described "the purpose of punitive damages, namely, 'not to compensate the plaintiff for any injury' but 'to punish the defendant' and 'for the added purpose of protecting the public by [deterring] the defendant and others from doing such wrong in the future' "; and directed the jury to " 'take into consideration the character and the degree of the wrong as shown by the evidence.' " *Haslip*, 499 U.S. at 19, 111 S.Ct. at 1044 (alteration in original). The Supreme Court determined that "[t]he jury was adequately instructed" and stated:

> To be sure, the instructions gave the jury significant discretion in its determination of punitive damages. But that discretion was not unlimited. It was confined to deterrence and retribution, the state policy concerns sought to be advanced. . . .
> These instructions, we believe, reasonably accommodated [the defendant's] interest in rational decisionmaking and Alabama's interest in meaningful individualized assessment of appropriate deterrence and retribution. The discretion allowed under Alabama law in determining punitive damages is no greater than that pursued in many familiar areas of the law as, for example, deciding "the best interests of the child," or "reasonable care," or "due diligence," or appropriate compensation for pain and suffering or mental anguish. As long as the discretion is exercised within reasonable constraints, due process is satisfied.

*Haslip*, 499 U.S. at 19-20, 23, 111 S.Ct. at 1044, 1046 (footnote omitted).[22]

---

[22] The flexibility inherent in the instructions given in this case is critical to an individualized assessment of punitive damages. As Justice O'Connor noted in *Haslip*, states have "a legitimate interest in avoiding rigid strictures so that a jury may tailor its award to specific facts," and due

¶164 On appeal, the Defendants challenge only one portion of the instructions regarding punitive damages—the instruction that the jury consider Defendants' financial condition as a factor in fixing the amount. As we have noted above, Defendants' argument on that issue is incorrect as a matter of law. Thus, as the Defendants do not present any other procedural issues, we only undertake a substantive due process analysis.

¶165 As for judicial review at the trial court level, § 27-1-221(7)(c), MCA, provides that all jury awards of punitive damages must be reviewed by the trial judge prior to judgment. This statute allows the judge to adjust the punitive damages verdict and requires that he or she "clearly state the reasons for increasing, decreasing, or not increasing or decreasing the punitive damages award of the jury in findings of fact and conclusions of law." Section 27-1-221(7)(c), MCA. In doing so, the judge must demonstrate consideration of each of the following factors:

> (i) the nature and reprehensibility of the defendant's wrongdoing;
> (ii) the extent of the defendant's wrongdoing;
> (iii) the intent of the defendant in committing the wrong;
> (iv) the profitability of the defendant's wrongdoing, if applicable;
> (v) the amount of actual damages awarded by the jury;
> (vi) the defendant's net worth;
> (vii) previous awards of punitive or exemplary damages against the defendant based upon the same wrongful act;
> (viii) potential or prior criminal sanctions against the defendant based upon the same wrongful act; and
> (ix) any other circumstances that may operate to increase or reduce, without wholly defeating, punitive damages.

---

process does not require that juries "be straightjacketed into performing a particular calculus." *Haslip*, 499 U.S. at 59, 111 S.Ct. at 1064-65 (O'Connor, J., dissenting).

Section 27-1-221(7)(b), MCA.[23]  The United States Supreme Court has favorably cited this statute, indicating that judicial review pursuant to these factors "imposes a sufficiently definite and meaningful constraint" on punitive damages awards and provides a rational basis for determining "whether a particular award is greater than reasonably necessary to punish and deter." *Haslip*, 499 U.S. at 22, 111 S.Ct. at 1045-46.[24]

¶166   We now turn to the *Gore* guideposts.[25]

---

[23]   With one conclusory phrase at the end of their initial brief, the Defendants assert that proper application of these factors, as distinct from application of federal precedent, demonstrates that the jury's punitive damages verdicts are excessive.  We will not address this argument with a separate analysis of the statutory factors because the Defendants provide no supporting analysis, as required by M. R. App. P. 23(a)(4).  *State v. Ferguson*, 2005 MT 343, ¶ 38, 330 Mont. 103, ¶ 38, 126 P.3d 463, ¶ 38.

[24]   The *Haslip* decision addressed, inter alia, review standards developed by the Alabama Supreme Court which are similar to those contained in § 27-1-221, MCA.  *Haslip*, 499 U.S. at 20-23, 111 S.Ct. at 1044-46.  The United States Supreme Court stated:

> The application of these standards, we conclude, imposes a sufficiently definite and meaningful constraint on the discretion of Alabama factfinders in awarding punitive damages. . . .
> . . .  The standards provide for a rational relationship in determining whether a particular award is greater than reasonably necessary to punish and deter.  They surely are as specific as those adopted legislatively in Ohio Rev. Code Ann. § 2307.80(B) (Supp. 1989) and in Mont. Code Ann. § 27-1-221 (1989).

*Haslip*, 499 U.S. at 22-23, 111 S.Ct. at 1045-46.  Except for minor changes in style, the current version of § 27-1-221, MCA, is the same as the 1989 version cited in *Haslip*.

[25]   Recently, the United States Supreme Court added to its punitive damages jurisprudence in *Philip Morris USA v. Williams*, No. 05-1256 (U.S. Feb. 20, 2007).  That decision does not provide any new guidance as to how the *Gore* guideposts must be applied   Rather, *Williams* holds that, as a matter of procedural due process, a State may not "use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, *i.e.*, injury that it inflicts upon those who are, essentially, strangers to the litigation." *Williams*, slip op. at 5.  Although Philip Morris raised a question of substantive due process in challenging the amount of the punitive damages verdict rendered against it, the Supreme Court explicitly declined to address that issue.  *Williams*, slip op. at 5.  In the instant appeal, as noted above, we only address the matter of substantive due process—i.e., we must apply the *Gore* guideposts to determine whether the amount of the punitive damages verdict is constitutionally excessive.  *Williams* provides no directives for that task.  Additionally, while this appeal involves conduct that has two distinct aspects—i.e., the malicious actions directed at Seltzer, and GDC's

**Reprehensibility**

¶167   The first *Gore* guidepost requires that we assess the degree of reprehensibility of the defendant's misconduct.  *Campbell*, 538 U.S. at 418, 123 S.Ct. at 1520.  As the United States Supreme Court has stated:

> "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."  We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.  The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.

*Campbell*, 538 U.S. at 419, 123 S.Ct. at 1521 (internal citations omitted).

¶168   In considering these factors, we observe that the District Court's detailed post-verdict findings are consistent with the evidence presented at trial and the jury's verdict.  The court found that clear and convincing evidence established the Defendants knew that:

> (1) a reasonable and legitimate question existed as to the authenticity of the subject painting;
> (2) it was highly probable that Seltzer was correct in his opinion that the subject painting was not an authentic work of C. M. Russell;
> (3) Seltzer had not knowingly published false statements "with the intent to defame the painting and the Mortons' reputation for honesty and fair dealing";

---

flagrant affront to the judicial system—no issue is raised nor was any evidence admitted as to whether this conduct harmed nonparties.  The jury did not punish GDC for harm to nonparties.  Thus, we do not rely on *Williams* in our analysis of the punitive damages verdict in this case, and we therefore need not order supplemental briefing from the parties regarding that case.

(4) Seltzer had not knowingly made a false claim that the painting was not an authentic Russell with the intent to impair the Mortons' ability to sell the painting;

(5) Seltzer had not knowingly made a false claim that the painting was not an authentic Russell with the intent to damage the Mortons' business relationship with the Coeur d'Alene Art Auction, Christie's Auction House, or other auction houses;

(6) Seltzer had not recklessly or carelessly challenged the authenticity of the painting;

(7) Seltzer had not recklessly or carelessly refused "to recant or withdraw his statements when presented with evidence that the signature on the painting was not" a forgery; and

(8) in rendering and standing by his opinion, Seltzer was not guilty of actual malice or actual fraud, as defined by §§ 27-1-221(2) and 27-1-221(3), MCA.

¶169 The court further found that the Defendants

knew or intentionally disregarded the fact that, unless he immediately capitulated as contemplated, making such allegations against Seltzer in a lawsuit would cause him to suffer emotional distress, damage his professional and personal reputation, and cause him to incur substantial defense costs. Notwithstanding, for the sole purpose of furthering their own ulterior purpose of forcing Seltzer to publicly recant his opinion and admit error to facilitate Morton's financial gain, Defendants deliberately proceeded to commence and prosecute the underlying lawsuit in conscious or intentional disregard or indifference to the high probability of causing Seltzer to suffer emotional distress, damage to his professional reputation for competence and honesty, damage to his personal reputation for honesty, and to incur substantial defense costs.

As evidenced by Dennis Gladwell's trial testimony, Defendants not only were aware of these consequences to Seltzer, they arrogantly counted on them to intimidate Seltzer into a quick and tidy "settlement" that would essentially require him to: (1) completely capitulate by publicly recanting his opinion; (2) admitting error or incompetence; (3) pay Morton the difference between the actual selling price of the painting and his original profit expectancy contemplated prior to Seltzer's opinion; and (4) pay Morton an additional $50,000 for his trouble in stifling Seltzer's opinion. Defendants assumed and counted on the fact that Seltzer most likely was of relatively insignificant means and was therefore financially vulnerable and susceptible to such intimidation. Defendants blatantly and maliciously tried to intimidate Seltzer with the apparent power, prestige, and resources of a large, nationally prominent law firm coupled with an ominous lawsuit that

85

they knew threatened to ruin and devastate him professionally, personally, and financially.

¶170 Additionally, the District Court found that

the manifest and acknowledged objective of the lawsuit was not to obtain an adjudication of the merits of the asserted claims, but rather to threaten Seltzer and force a negotiated retraction and disavowal of his opinion thereby enabling the Mortons to sell the painting at full market value as an authentic Russell.

In fact, the "disavowal" GDC sought from Seltzer amounted to a pure misrepresentation of his professional opinion. As noted above, GDC literally demanded that Seltzer lie, under oath, about his true conviction by drafting "a letter to our specifications completely recanting and withdrawing" his statements under penalty of perjury. Further, this demand was made under threat of an immediate lawsuit in which GDC stated it would seek punitive damages.

¶171 After the malicious lawsuit was filed, GDC made matters even worse by abusing the discovery process, thereby undermining Seltzer's ability to defend himself. As the District Court found, GDC abused discovery when it "intentionally withheld certain non-privileged correspondence generated by the Mortons' former attorney, Joshua Rievman, including the March 14, 2001, correspondence from Rievman to the Kennedy Galleries containing key admissions against interest by the Mortons." That letter stated, inter alia: "the Mortons have been shocked to learn that the painting is not a work by Russell. . . . The Mortons consider Kennedy Galleries' fraudulent (or, at the very least, negligent) misrepresentations to be an extremely serious matter and intend to hold Kennedy Galleries liable for the damages they have suffered." GDC also withheld

Morton's letter to Ginger Renner wherein he expressed his "state of shock" upon learning her opinion of the painting's authenticity, and requested that she provide him a letter formally expressing her professional opinion in order to help him determine a course of action. The District Court found:

> Defendants concealed damaging admissions by Morton to Ginger Renner and, through counsel (Rievman), to the Kennedy Galleries. These admissions were extremely damaging to Defendants' asserted position because they showed that Defendants were well aware from the outset that the painting was probably not an authentic Russell and that Seltzer was not trying to maliciously damage the Mortons by knowingly and maliciously making false statements about the authenticity of the painting.

The District Court also found that the letter from Morton to Renner was unquestionably relevant to "the heart of the claims and defenses at issue" in the underlying action against Seltzer. The *Gore* decision notes that "concealment of evidence of improper motive" may be taken into consideration when assessing the reprehensibility of a defendant's conduct. *Gore*, 517 U.S. at 579, 116 S.Ct. at 1601. Thus, we note that GDC amplified the reprehensibility of its conduct by concealing evidence relevant to the motives underlying the suit against Seltzer. And all of this behavior was conducted, in part, pursuant to GDC's purported representation of Frank Morton, who had not authorized GDC to file suit on his behalf, and had not even communicated with Gladwell or any other member of GDC prior to the instigation of the lawsuit. Further, while the Defendant's were still seeking damages from Seltzer in the underlying suit pursuant to their allegation that he had "falsely claimed that the painting is not authentic," GDC was at the same time demanding that the Amon Carter Museum and the Kennedy Galleries

87

"provide the Mortons with an authentic C. M. Russell" in exchange for "Lassoing a Longhorn."

¶172  Finally, as for the harm caused to Seltzer, the District Court found that the Defendants' misconduct "caused Seltzer to needlessly suffer severe emotional distress for approximately 9 months, suffer significant physical complications as a result of emotional distress, suffer serious damage to his personal and professional reputation, and incur substantial defense costs."

¶173  We conclude that *Gore*'s reprehensibility factors indicate GDC's conduct was highly reprehensible.  This conduct evinced an indifference to and a reckless disregard of Seltzer's financial, psychological, and physical wellbeing, as well as his personal and professional reputation.  None of the conduct at issue was accidental; GDC acted with actual malice, as found by the jury, and GDC does not contest that finding.  As a direct result of GDC's malicious conduct, Seltzer suffered severe emotional distress which resulted in debilitating physical trauma; he suffered serious damage to his impeccable personal and professional reputation which he had built up over his lifetime; and he incurred over $45,000.00 in attorney fees in defending himself for nearly seven months. While the record does not contain extensive evidence regarding Seltzer's financial means, it does demonstrate that he was in a position of relative financial vulnerability.  It is established that an adverse compensatory damages award of roughly $700,000.00, as sought in the underlying Complaint, would have forced Seltzer into bankruptcy. Additionally, while he was able to hire counsel to defend himself, Seltzer lacked the

funds to pay his attorney's hourly fee at that time. As the District Court found, Seltzer had a "relative lack of resources to defend himself."

¶174 Several additional factors must be taken into account: (1) as the District Court found, there is no evidence that GDC's misconduct was driven by "any significant profit motive, other than to remain in favorable standing with Steve Morton, a prominent client of the firm"; (2) the wrongdoing at issue is a single episode of damaging misconduct, rather than repeated instances;[26] and (3) there is no evidence that GDC has previously engaged in such misconduct. However, these factors do not reduce the high level of reprehensibility already established by the other aspects of GDC's misconduct.

---

[26] Because recidivism is an important factor in the reprehensibility analysis, *Gore*, 517 U.S. at 577, 116 S.Ct at 1599-1600; *Campbell*, 538 U.S. at 419, 123 S.Ct. at 1521, and because some of GDC's misconduct in the instant action replicates that committed in the underlying suit against Seltzer, we clarify the proper scope of our analysis. Consistent with its tactics in the underlying suit, GDC has, in the instant suit, continued to disregard fundamental litigation rules and basic principles of professional conduct. For example, GDC blatantly misrepresented an important fact in one of its motions filed with the District Court. Specifically, GDC asserted that none of the Defendants were aware of Ginger Renner's opinion regarding the authenticity of the painting when they filed suit against Seltzer. However, the evidence at trial in this case demonstrated that, prior to the instigation of the suit against Seltzer, Renner had expressed her professional opinion in a letter to Morton, GDC had obtained the letter, and Gladwell had read it. Additionally, as noted above, GDC abused the discovery process in the instant action when it concealed two documents that the District Court subsequently found to be "highly relevant." As noted above, the District Court found that GDC's non-disclosure "impaired Seltzer's ability to depose key witnesses . . . [and] impaired his ability to meaningfully follow up and investigate." Further, GDC abused discovery when Seltzer's counsel traveled to Irvine, California to conduct depositions. As the District Court found: (1) GDC impeded fair discovery by interjecting a "high number of obstreperous and excessive objections and interruptions"; and (2) "the last minute designation of Mr. Gladwell as [GDC's] corporate representative with the knowledge that he was then on a plane or in transit, but certainly not available locally at the cite of the California deposition, was obstructive and manipulative, in violation of the rules of discovery." GDC was sanctioned for its abuses of discovery in this case and has not appealed those sanctions. In our reprehensibility analysis here, we do not consider GDC's aforementioned misconduct in the instant action. Although recidivism is an important consideration in the reprehensibility analysis, the subject of this case is only the conduct that occurred before Seltzer filed suit against the Defendants.

¶175 Abusive conduct toward an individual which causes the type of harm at issue here merits considerable punishment regardless of the setting in which it takes place. However, the fact that GDC utilized the judicial system as a tool to accomplish intimidation and oppression makes this behavior uniquely egregious. As the District Court stated:

> Although no less damaging, it may have been less reprehensible if a legal layman had devised and attempted to execute this scheme. However, it is even more reprehensible that a highly experienced trial attorney [of GDC] not only condoned this conduct, but in fact devised it, recommended it to the lay client, and aggressively prosecuted it on the client's behalf. As embodied in the Rules of Professional Conduct, lawyers have a special and essential professional responsibility to vigilantly safeguard against abusive litigation practices that impair or defeat the administration of justice rather than facilitate it. At its core, this case involved an extremely abusive, malicious, and oppressive litigation practice devised and executed by a prominent and experienced lawyer who had a professional gate-keeping duty to know better and discourage such abuses.

¶176 The goal of every trial is "a search for the truth." *Finstad v. W.R. Grace & Co.*, 2000 MT 228, ¶ 38, 301 Mont. 240, ¶ 38, 8 P.3d 778, ¶ 38 (holding that it would frustrate this goal if the fact that the plaintiffs were the true recipients of punitive damages awards were kept from the jury). *See also Oliver v. Stimson Lumber Co.*, 1999 MT 328, ¶ 31, 297 Mont. 336, ¶ 31, 993 P.2d 11, ¶ 31 (condemning intentional or negligent spoliation of evidence because "[r]elevant evidence is critical to the search for truth."). In 2004, this well-settled principle of Montana law was included in the first sentence of the Preamble to the Montana Rules of Professional Conduct, which states: "A lawyer shall always pursue the truth."

¶177 Here, GDC's conduct represents the antithesis of the pursuit of truth. Montana's approach to such perversions of judicial process is demonstrated, inter alia, in our jurisprudence dealing with discovery abuse. This Court has enunciated a "policy of intolerance regarding discovery abuse pursuant to our concern over crowded dockets and the need to maintain fair and efficient judicial administration of pending cases." *Richardson v. State*, 2006 MT 43, ¶ 57, 331 Mont. 231, ¶ 57, 130 P.3d 634, ¶ 57 (citation and internal quotation marks omitted). Indeed, litigants who force courts to expend judicial resources dealing with discovery abuse "in this era of crowded dockets . . . deprive other litigants of an opportunity to use the courts as a serious dispute-settlement mechanism." *Richardson*, ¶ 57 (citation and internal quotation marks omitted). Accordingly, we have stated that "the price for dishonesty must be made unbearable to thwart the inevitable temptation that zealous advocacy inspires." *Richardson*, ¶ 56 (citation and internal quotation marks omitted).

¶178 The consequence of this policy of intolerance is, in some cases, dismissal of the case with prejudice, see *Jerome v. Pardis*, 240 Mont. 187, 193, 783 P.2d 919, 923 (1989), and in other cases, the imposition of default judgment on the issue of liability, see *Richardson*, ¶ 69; *Culbertson Health Care Corp. v. JP Stevens & Co.*, 2005 MT 254, ¶ 21, 329 Mont. 38, ¶ 21, 122 P.3d 431, ¶ 21; *Schuff v. A.T. Klemens & Son*, 2000 MT 357, ¶ 82, 303 Mont. 274, ¶ 82, 16 P.3d 1002, ¶ 82. Our approach to the conduct at issue here is no less lenient. Indeed, our concerns are even more acute with respect to baseless and malicious lawsuits.

¶179 At oral argument, counsel for GDC attempted to minimize the reprehensibility of the firm's conduct by arguing that litigation is a common occurrence and the "essence of the system" is to reach a verdict on the merits. Among other things, counsel argued:

> Clients bring demands letters to me every day . . . and sometimes they settle, sometimes they say: "Bring it on. In a court of law you're going to lose." . . . I believe that, in court, ya know, "bring it on"—if they've got a good lawsuit, a jury will find one way, if they don't, a jury will find the other way. And that's the essence of the system.

We take exception to this notion. The "essence" of our judicial system is not simply the resolution of disputes; rather, it is the resolution of *legitimate* disputes. Baseless lawsuits prosecuted in furtherance of ulterior motives have no place in our courts. Moreover, the sort of saber-rattling, chest-thumping approach typified by the comment of GDC's counsel, trivializes the devastating effects on the health, reputations, and fortunes of the real people who are maliciously and abusively sued. For the ordinary citizens who are the victims of such a lawsuit, it may be the most horrific experience of their lives. Indeed, those effects are not merely the collateral damage of some run-of-the-mill litigation battle between attorneys. Rather, the defendants in such cases are the innocent casualties of the war. That is why the "essence of the system" with respect to such lawsuits is to provide recourse for the victim and levy punishment against the perpetrator by way of actions for abuse of process and malicious prosecution. Thus, the "essence of the system" was evident in the instant suit by Seltzer's recovery of compensatory damages and the jury's assessment of a severe punitive sanction against GDC.

¶180 In short, GDC's use of the judicial system amounts to legal thuggery. This behavior is truly repugnant to Montana's foundational notions of justice and is therefore

highly reprehensible. Thus, in accordance with Montana's legitimate interest in punishment and deterrence, we conclude that a particularly severe sanction comports with due process.

**Ratio**

¶181   The second *Gore* guidepost requires us to consider the disparity, or ratio, between the actual or potential harm suffered by the plaintiff and the punitive damages award. *Campbell*, 538 U.S. at 418, 123 S.Ct. at 1520.   The United States Supreme Court has steadfastly refused to establish a bright-line ratio in defining due process constraints on punitive damages.   The *Gore* decision states:

> Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. . . . [We] reiterate our rejection of a categorical approach.   Once again, "we return to what we said in *Haslip*: 'We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case.   We can say, however, that a general concern of reasonableness properly enters into the constitutional calculus.' "

*Gore*, 517 U.S. at 582-83, 116 S.Ct. at 1602 (internal footnote, alterations, and citation omitted); *see also Campbell*, 538 U.S. at 425, 123 S.Ct. at 1524 ("We decline again to impose a bright-line ratio which a punitive damages award cannot exceed.").[27]

---

[27]   On remand following the United States Supreme Court's decision in *Gore*, the Alabama Supreme Court explained the problem with a bright-line ratio:

> Although it is difficult to determine case by case what ratio of punitive damages to compensatory damages is excessive, we reject the easy answer of adopting one ratio that would apply to all and would therefore give a wrongdoer *precise* notice of the penalty that his misconduct might incur.   To do so would frustrate the purpose of punitive damages, which is to punish and deter a defendant's misconduct.   A ratio that could be deemed reasonable in many cases

¶182 Although "there are no rigid benchmarks that a punitive damages award may not surpass," *Campbell*, 538 U.S. at 425, 123 S.Ct. at 1524, some general guidelines inform the analysis under the ratio guidepost. In *Campbell*, the Supreme Court stated that

> in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. . . . Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, [as in *Gore*], or, [as in *Campbell*], of 145 to 1.

*Campbell*, 538 U.S. at 425, 123 S.Ct. at 1524.[28] In *Gore*, the Supreme Court stated that

> low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

*Gore*, 517 U.S. at 582, 116 S.Ct. at 1602. *Campbell* reiterated these statements from *Gore*, but further stated: "The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Campbell*, 538 U.S. at 425, 123 S.Ct. at 1524. *Campbell* then stated the overriding principle: "The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Campbell*, 538 U.S. at 425, 123 S.Ct. at 1524.

---

> might well be insufficient in cases where the defendant has reaped great profit from its conduct, or where its conduct is particularly reprehensible.

*BMW of North America, Inc. v. Gore*, 701 So.2d 507, 513 (Ala. 1997).

[28] In stating this principle, the United States Supreme Court cited, inter alia, instructive language in *Gore* referencing "a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish." *Campbell*, 538 U.S. at 425, 123 S.Ct. at 1524 (citing *Gore*, 517 U.S. at 581, 116 S.Ct. at 1601).

¶183   The subtleties in these ratio guidelines require us to examine the Supreme Court's statements closely.   The statement that "[s]ingle-digit multipliers are more likely to comport with due process," being rather imprecise by itself, is brought into sharper focus by the statement that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  *Campbell*, 538 U.S. at 425, 123 S.Ct. at 1524.   The qualifying language "few awards" and "to a significant degree" appear to provide important guidance.   The plain terms of these statements, taken together, indicate that while double-digit ratios are often less likely to comport with due process, they can be appropriate if they do not exceed single-digit ratios "to a significant degree"; and even when the ratio exceeds single digits to "a significant degree," it may yet constitute one of the "few" double-digit ratios that nonetheless comports with due process.

¶184 While the two aforementioned statements discuss ratios exclusively, other statements by the Supreme Court discuss ratios with specific reference to the amount of compensatory damages awarded.   As noted above, "low awards of compensatory damages may properly support a higher ratio than high compensatory awards,"[29] *Gore*,

---

[29]   *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 113 S.Ct. 2711 (1993), recites language from a decision of the West Virginia Supreme Court of Appeals that is consistent with this principle:
> "For instance, a man wildly fires a gun into a crowd.  By sheer chance, no one is injured and the only damage is to a $10 pair of glasses.  A jury reasonably could find only $10 in compensatory damages, but thousands of dollars in punitive damages to teach a duty of care.  We would allow a jury to impose substantial punitive damages in order to discourage future bad acts."

*TXO*, 509 U.S. at 459-60, 113 S.Ct. at 2721 (plurality opinion) (quoting *Garnes v. Fleming Landfill, Inc.*, 413 S.E.2d 897, 902 (W.Va. 1991).   We note that the Fifth Circuit Court of Appeals has concluded that *Campbell*'s discussion of the proper ratio between punitive and

517 U.S. at 582, 116 S.Ct. at 1602; and conversely, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee," *Campbell*, 538 U.S. at 425, 123 S.Ct. at 1524. Consistent with the Supreme Court's refusal to establish rigid benchmarks, these statements provide guidance rather than a specific mandate—i.e., in the same way that low compensatory awards "may" justify higher ratios, smaller ratios "can" reach the outermost limits of due process when the compensatory award is substantial. In other words, it appears that low compensatory awards may, but do not necessarily, justify higher ratios;[30] and in the same way, substantial compensatory awards may, but do not necessarily, require lower ratios. Thus, we reject GDC's assertion that "a 9:1 ratio is in almost all cases the constitutional limit." This assertion simply contradicts the Supreme Court's statements regarding *Gore*'s ratio guidepost.

¶185 The principle that substantial compensatory damages do not always require low single-digit ratios is born out in recent caselaw. In *Campbell*, the plaintiffs brought a bad faith action against State Farm which resulted in a $1 million compensatory damages award and a $145 million punitive damages verdict. *Campbell*, 538 U.S. at 414-15, 123 S.Ct. at 1518-19. In reversing the Utah Supreme Court's decision to uphold the punitive damages verdict, the United States Supreme Court concluded, inter alia, that the ratio of

---

compensatory damages is inapposite to cases where punitive damages are awarded with nominal damages. *Williams v. Kaufman County*, 352 F.3d 994, 1016, n.76 (5th Cir. 2003).

[30] Further, the two instances referenced in *Gore* and *Campbell* where low compensatory awards may justify higher ratios—i.e., where a particularly egregious act has resulted in only a small amount of economic damages, and where the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine—do not appear to be an exclusive list, but are merely examples. *Gore*, 517 U.S. at 582, 116 S.Ct. at 1602; *Campbell*, 538 U.S. at 425, 123 S.Ct. at 1524.

145:1 was presumptively inappropriate given the facts of the case.[31] *Campbell*, 538 U.S. at 426, 123 S.Ct. at 1524.

¶186   In remanding to the Utah Supreme Court, the United States Supreme Court stated that, in light of the "substantial" compensatory damages awarded, the *Gore* guideposts "likely would justify a punitive damages award at or near the amount of compensatory damages." *Campbell*, 538 U.S. at 429, 123 S.Ct. at 1526.  On remand, the Utah Supreme Court took a different view, instead reducing the punitive damages award to approximately $9.02 million.  *Campbell v. State Farm Mutual Auto. Ins. Co.*, 98 P.3d 409, 410 (Utah 2004).  In interpreting *Campbell*, 538 U.S. 408, 123 S.Ct. 1513,  the Utah Supreme Court stated:

> The 1-to-1 ratio between compensatory and punitive damages is most applicable where a sizeable compensatory damages award for economic injury is coupled with conduct of unremarkable reprehensibility.  This scenario . . . does not describe this case.
>     . . .  Simply put, the trial court's determination that State Farm caused the Campbells $1 million of emotional distress warrants condemnation in the upper single-digit ratio range rather than the 1-to-1 ratio urged by State Farm.
>     . . . .
>     In sum, the Supreme Court affirmed the authority of a state to "make its own reasoned judgment about what conduct is permitted or proscribed within its borders." *Campbell II*, 538 U.S. at 422, 123 S.Ct. 1513 (citing *Gore*, 517 U.S. at 569, 116 S.Ct. 1589).  It follows, therefore, that each state retains the right and the responsibility to draw on its own values and traditions when assessing the reprehensibility of tortious conduct for the purpose of reviewing the propriety of a punitive damages award, so long as that review conforms to the *Gore* guidelines and the demands of due process.  To the extent that our conclusions about what size punitive

---

[31]  The Supreme Court also concluded, inter alia, the Utah Supreme Court inappropriately relied on State Farm's out-of-state conduct that was dissimilar to the conduct on which liability was premised, and some of which was lawful where it occurred.  *Campbell*, 538 U.S. at 420-24, 123 S.Ct. at 1521-24.

> damages award best serves the legitimate interests of Utah exceeds an award suggested by the Supreme Court, we are exercising what we interpret to be a clear grant of discretion to do so.

*Campbell*, 98 P.3d at 418-19.

¶187 State Farm, having interpreted *Campbell*'s ratio language as categorical rules rather than guidelines, again appealed to the United States Supreme Court, asserting that the Utah Supreme Court had "egregiously disregarded" the Supreme Court's guidance, and argued: "Reversal of the Utah Supreme Court's decision is essential to ensure that [the Supreme] Court's guidance is heeded by the lower courts."[32] The United States Supreme Court declined to review the case again. *State Farm Mutual Auto. Ins. Co. v. Campbell*, 543 U.S. 874, 125 S.Ct. 114 (2004).

¶188 Consistent with the Utah Supreme Court's view, the Ninth Circuit Court of Appeals has recognized that *Campbell*'s reference to a 1:1 ratio does not establish a categorical rule in favor of a 1:1 ratio where compensatory damages are substantial. The Court in *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1003, 1014 (9th Cir. 2004), declined to impose a 1:1 ratio as requested by the defendants, and instead upheld the punitive damages award of $5 million together with compensatory damages of $2,670,849.00. In doing so, the Court noted that the United States Supreme Court has consistently rejected any simple mathematical formula or bright-line ratio as controlling in the constitutional inquiry, and further stated: "[*Campbell*'s] 1:1 compensatory to punitive damages ratio is not binding, no matter how factually similar the cases may be."

---

[32] Petitioner's Reply Brief in support of Petition for Writ of Certiorari, U.S. Supreme Court No. 04-0116, 2004 WL 2021252.

*Hangarter*, 373 F.3d at 1014-15.  As do the Utah Supreme Court and the Ninth Circuit Court of Appeals, we recognize the flexible nature of *Gore*'s ratio guidelines.  At the same time, however, we acknowledge that *Campbell* stands for the general proposition that lower ratios are often more likely to comport with due process where compensatory damages are "substantial."  *Campbell*, 538 U.S. at 425, 123 S.Ct. at 1524.

¶189  Here, the jury's punitive damages verdict of $20 million against GDC, which represents approximately 7.7% of the firm's net worth of $260 million[33] and approximately 3.1% of the firm's 2003 gross revenues of $645,325,506.00, yields a ratio of approximately 18.2:1.  We first consider whether this ratio exceeds single-digit ratios "to a significant degree."  C*ampbell*, 538 U.S. at 425, 123 S.Ct. at 1524.  While it seems clear that ratios such as 12:1 and 15:1 do not exceed single digits "to a significant degree," it is equally clear that a ratio of 100:1 does so.  Given that the Supreme Court's remark regarding excess "to a significant degree" and its statement that "[s]ingle-digit multipliers are more likely to comport with due process" were both coupled with a reference to excessive ratios of 500:1 and 145:1, *Campbell*, 538 U.S. at 425, 123 S.Ct. at 1524, we conclude that a ratio of 18:1 does not exceed single digits "to a significant degree."  However, that does not end our analysis.  We must take into account the size of the compensatory damages awarded by the jury.  The compensatory damages of $1.1 million awarded in this case can fairly be characterized as "substantial," as was the

---

[33]  In its review of the punitive damages verdict, the District Court acknowledged that evidence indicates GDC's net worth may be as high as $800 million.  However, for the purposes of its review, the court found GDC's net worth to be $260 million.  That finding has not been challenged on appeal.

compensatory award of $1 million in *Campbell*. *Campbell*, 538 U.S. at 426, 123 S.Ct. at 1524. Thus, it appears that a single-digit ratio, although not compulsory, is more likely to comport with due process.[34]

**Comparable Penalties**

¶190 The third *Gore* guidepost requires us to consider the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Campbell*, 538 U.S. at 418, 123 S.Ct. at 1520. The Supreme Court has stated that "a reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *Gore*, 517 U.S. at 583, 116 S.Ct. at 1603 (internal quotation marks omitted).

¶191 Despite mandating this "substantial deference" to legislative judgments, the Supreme Court has also indicated that far greater disparities are acceptable here than are acceptable under *Gore*'s ratio guidepost. In *Campbell*, the Supreme Court noted that a $10,000.00 fine for fraud was the "most relevant civil sanction" for the conduct at issue, and then proceeded to endorse (but not mandate) a punitive damages award of $1 million. *Campbell*, 538 U.S. at 428-29, 123 S.Ct. at 1526. Thus, while the 145:1 ratio between

---

[34] Seltzer argues that we should be guided by the outcome in *TXO*, where the United States Supreme Court affirmed a punitive damages award that was 526 times as large as the compensatory damages award. *TXO*, 509 U.S. at 453, 466, 113 S.Ct. at 2718, 2724. While a majority of the Justices concurred in the judgment in *TXO*, only a plurality endorsed the substantive due process analysis authored by Justice Stevens. *TXO*, 509 U.S. at 446, 113 S.Ct. at 2714. Justice Scalia, joined by Justice Thomas, expressly rejected the plurality's substantive due process analysis and concurred in the judgment on the grounds that procedural due process was satisfied. *TXO*, 509 U.S. at 470-71, 113 S.Ct. at 2726-27. Accordingly, we cannot treat *TXO* as controlling authority regarding the ratio analysis.

punitive and compensatory damages ultimately did not comport with due process in that case, a 100:1 ratio between an appropriate punitive sanction and the most relevant legislatively established civil penalty was not inappropriate.

¶192  In addition to considering civil penalties, it is also appropriate to consider potential criminal penalties for the conduct at issue because these indicate the seriousness with which a state views the wrongful conduct.  *Campbell*, 538 U.S. at 428, 123 S.Ct. at 1526.  However, such consideration must be limited by the principle that civil process may not be used to assess criminal penalties.  *Campbell*, 538 U.S. at 428, 123 S.Ct. at 1526.

¶193  Serious criminal penalties exist in Montana for the conduct at issue here.  For example, a person[35] commits the offense of Deceptive Practices when the person purposely or knowingly "directs another to make a false or deceptive statement addressed to the public or any person for the purpose of promoting . . . the sale of property."  Section 45-6-317(1)(b), MCA.  Additionally, a person commits the offense of Solicitation "when, with the purpose that an offense [here Deceptive Practices] be committed, he commands, encourages, or facilitates the commission of that offense."  Section 45-4-101(1), MCA.  In this case, both offenses would have been felonies, § 45-2-101(23), MCA, because the value of the painting exceeded and would have been sold—as a bogus Russell—for in excess of $1,000.00.  Both offenses would have been punishable by a fine of up to $50,000.00 or imprisonment in the state prison for a term of up to 10 years, or both.  Sections 45-6-317(2), 45-4-101(2), MCA.  While our analysis under the third *Gore*

---

[35]  "Person" would include Morton and Gladwell individually and GDC as an L.L.P.  Section 45-2-101(57), MCA.

guidepost cannot be guided to any great extent by this criminal sanction, we take note that Montana's public policy, as expressed by the Legislature, evinces a grave concern with misconduct of the kind involved in this case. Our conclusion under *Gore*'s reprehensibility guidepost, that a particularly severe sanction for GDC's highly reprehensible conduct comports with due process, is consistent with this grave concern embodied in Montana's public policy.

¶194 As noted above, the Montana Legislature has limited punitive damages awards by enacting § 27-1-220(3), MCA, which provides: "An award for punitive damages may not exceed $10 million or 3% of a defendant's net worth, whichever is less. This subsection does not limit punitive damages that may be awarded in class action lawsuits." As we have concluded, this statutory cap does not apply to the punitive damages verdict in this case because it went into effect after Seltzer's cause of action accrued. Additionally, this statute does not establish a civil penalty for any particular conduct. Thus, it is inappropriate for this Court to treat § 27-1-220(3), MCA, with the "substantial deference" required for statutes that enunciate a relevant legislative judgment "concerning appropriate sanctions for the conduct at issue." *See Gore*, 517 U.S. at 583, 116 S.Ct. at 1603. However, § 27-1-220(3), MCA, does represent a legislative judgment regarding penalties in civil cases generally, and thus warrants our consideration.

¶195 Direct application of the statutory cap in this case would limit punitive damages against GDC to $7.8 million.[36] The jury's punitive damages verdict exceeds that amount

---

[36] This amount constitutes three percent of GDC's net worth, which, as previously noted, is established as $260 million for the purposes of this case.

by $12.2 million. Because strict compliance with legislatively established civil penalties is not mandated in this due process analysis, and because the statutory cap is of minimal relevance here, the third *Gore* guidepost provides only a minimal indication that this verdict may exceed due process.

**Summary**

¶196 Because federal due process jurisprudence compels us to render a decision that interferes with the jury's verdict, we pause here to clarify the nature of our de novo review in this case. It may appear that our analysis is an exercise in second-guessing the jury's punitive damages verdict—a verdict which the District Court characterized as a "reasoned and dispassionate judgment"—and supplanting it with one of our own choosing. However, we stress that our task on appeal is not to determine what amount of punishment we would have assessed against GDC had we been members of the jury. Indeed, given the jury's traditional task of assessing punitive damages and this Court's well-established deference to jury verdicts, we conduct our review with a good deal of caution. Moreover, we have no doubt that the jury was motivated solely by a rational concern with punishment and deterrence, and we reject GDC's conclusory assertions to the contrary. However, we are required to apply the *Gore* guideposts de novo to determine whether the verdict has exceeded the outermost limit of due process. In other words, we are not assessing a penalty of our own choosing; rather, we are ascertaining the boundary of due process.

¶197 The reprehensibility guidepost indicates that a particularly severe punishment comports with due process. The ratio guidepost indicates that a single-digit ratio between

punitive and compensatory damages is more likely to comport with due process than the 18:1 ratio yielded by the jury's verdict. The comparable penalties guidepost provides a minimal indication that an award near the statutory cap would likely comport with due process.

¶198 We place primary emphasis on the reprehensibility guidepost because *Campbell* states that the "most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Campbell*, 538 U.S. at 419, 123 S.Ct. at 1521. Considering the ratio guidepost in light of the need for a particularly severe punishment in order to serve Montana's legitimate interest in punishment and deterrence, as established under the reprehensibility guidepost, it becomes clear that only the highest single-digit multiplier would be appropriate. But for the facts that GDC does not have a history of this kind of misconduct and its conduct was not driven by a significant profit motive, a double-digit multiplier would undoubtedly comport with due process. Finally, to the minimal extent that the comparable penalties guidepost suggests reduction of the punitive verdict to a level near the statutory cap, that limited indication is relatively consistent with the indications we find under the previous two guideposts.

¶199 Accordingly, we conclude, as did the District Court, that the *Gore* guideposts provide for a punitive sanction of not more than $9.9 million in this case. This penalty adequately serves Montana's interest in punishment and deterrence, thereby protecting its citizens and preserving the integrity of the judicial system, while comporting with the

constraints of due process. Thus, the District Court did not err in applying federal due process law to the jury's punitive damages verdict.

## CONCLUSION

¶200   We affirm the District Court in all respects.

/S/ JAMES C. NELSON

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS
/S/ JIM RICE
/S/  JOHN C. BROWN
     District Court Judge John C. Brown
      sitting for Justice W. William Leaphart